**NOT RECOMMENDED FOR PUBLICATION**
File Name: 06a0850n.06
Filed: November 20, 2006

**No. 05-6330**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

DARRYL HAUGHTON,

     **Plaintiff-Appellant,**

v.

ORCHID AUTOMATION,

     **Defendant-Appellee.**

                       /

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE**

**BEFORE:**    **CLAY and ROGERS, Circuit Judges; KATZ, District Judge.**[*]

    **CLAY, Circuit Judge.**  Plaintiff-Appellant, Darryl Haughton, appeals from the district court's grant of summary judgment to Defendant-Appellee, Orchid Automation, on his claim that Defendant-Appellee discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e and 42 U.S.C. § 1981. For the reasons that follow, we **AFFIRM.**

**BACKGROUND**

    **A.**    **Substantive Facts**

---

    [*]The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

Plaintiff, Darryl Haughton, began working for Defendant, Orchid Automation, as a temporary employee at its Gordonsville, Tennessee assembly plant in January 2000. During Plaintiff's nine weeks as a temporary employee, he worked the second shift as an assembly worker at Defendant's plant. After working three weeks at the plant, Plaintiff interviewed with Defendant's Production Manager, Ron Hall, and Director of Operations, Craig Woodard, for the position of Team Leader. Defendant considered approximately six candidates for this position and ultimately offered the position to Plaintiff in a letter dated February 17, 2000. Plaintiff began working full-time as Team Leader of the first shift on February 21, 2000.

As Team Leader, Plaintiff "supervised a shift of assembly workers," and had responsibility "for producing quality parts, helping employees produce quality parts, ensuring a safe work environment, and ensuring productivity." (J.A. at 255-56) In turn, Production Manager Hall directly supervised Plaintiff. By all accounts, Defendant's managerial staff – including the Plant Manager, Production Manager, and Director of Operations – "considered Plaintiff to be a 'very good employee'" until September 15, 2001. (J.A. at 256) Also prior to that date, Defendant received no complaints about Plaintiff, nor had Plaintiff's subordinates expressed concerns over working with him. Additionally, Plaintiff reported a positive working relationship with Hall. He indicated that Hall had generally been supportive, and specifically had been integral in promoting Plaintiff to Team Leader and securing a pay increase for Plaintiff.

On September 15, 2001, two of Plaintiff's subordinates – Teresa Craighead ("Craighead") and Wanda Haney ("Haney") – called Production Manager Hall at home. At the time they placed the call, the first shift that day had not yet completed its work. Craighead and Haney "were very

upset" and reported that Plaintiff had "given them a cussing," had "called them certain things," and "had been mouthing around."[1] (J.A. at 257) According to Craighead and Haney, when they asked Plaintiff to bring them a part, Plaintiff responded: "Can't you see I'm fucking busy" and "I'm tired of those stupid bitches tell [sic] me when I need to get them."[2] (J.A. at 258) Plaintiff admitted that he yelled at Craighead and Haney that day and said he "wasn't going to get their parts no damn faster than [he] could bring them." (J.A. at 260, 275) Plaintiff denied using any other inappropriate language.

Because Production Manager Hall anticipated an absence from the office Monday morning, he instructed Craighead and Haney to meet with Plant Manager Powers upon arrival at work that morning. Hall further assured Craighead and Haney that the management would "get to the bottom of their concerns." (J.A. at 259) Additionally, Hall contacted Powers to inform him of the situation and suggested that Defendant investigate the allegations against Plaintiff.

On Monday, September 17, 2001, Powers initiated an investigation into the complaints against Plaintiff, directing Hall to work with Norma McClard, the Administrative Assistant at the plant, to question witnesses. The investigation began with interviews of employees who were present during the first shift that Saturday when the alleged incident occurred. These interviews

---

[1]Plaintiff denied this in his Response to Defendant's Statement of Undisputed Material Facts, and objected on hearsay grounds. The district court found the statements were "offered to show [Defendant's] state of mind and motive, rather than the truth of the matter asserted" and consequently were "not hearsay statements." (J.A. at 25)

[2]*See supra*, note 1.

spanned two days, and Plaintiff was not present while they were conducted.[3] Craighead and Haney made a joint statement. Therein, they indicated that Plaintiff responded to their request for parts by saying: "I heard you the fucking first time, I'm not fucking deaf. And I said stop, fucking dumb asses." (J.A. at 198-99, 263) Plaintiff then reportedly repeated "Bring me the fucking rails, bring me the fucking rails." (J.A. at 198-99, 263) Craighead and Haney further stated that they frequently heard Plaintiff threaten to "call the NAACP if the damn fucking people in the office fire him." (J.A. at 198-99, 263)

Additionally, Plaintiff's other subordinates reported hearing Plaintiff "curse and raise his voice at Craighead and Haney," and that Plaintiff called the two "dumb assess" and "stupid bitches." (J.A. at 261) Several employees requested a switch in shift as a result of Plaintiff's conduct. Some of these employees had previously requested shift changes citing personal reasons, but admitted during their interviews with management that "they felt intimidated by Plaintiff and the treatment that they received from him," and felt he could cause them to be fired. (J.A. at 262) In addition to corroborating Craighead and Haney's claims,[4] these employees reported additional instances of verbal harassment and threatening behavior on Plaintiff's part spanning several months. Moreover,

---

[3]Plaintiff also disputes the Defendant's statement of facts insofar as it recounts the comments of employees interviewed on September 17 and 18, 2001, which Plaintiff again argues are inadmissible hearsay. The district court also ruled these statements admissible as non-hearsay. *See supra*, note 1.

[4]Specifically, witness statements reflect that, during the September 15, 2001 incident, Plaintiff used the words "fucking dumb ass," (J.A. at 200), that he was "cussing," (J.A. at 201), that he said "fucking" and "damn," (J.A. at 204), that he "hasn't cussed [Craighead and Haney] until Saturday," (J.A. at 205), and that he stated he would "get the rails when he was good fucking ready. Some people need to keep their damn mouth shut. I hold everyone's job in my hands." (J.A. at 206)

4

they indicated that Plaintiff had, from time to time, falsified time cards of subordinates who "minded him" so they wouldn't be marked late to work, and with employees who did not "mind him," they said that Plaintiff simply allowed them to incur points for absenteeism. (J.A. at 266-67)

During the investigation, Hall and McClard also interviewed Plaintiff. Their meeting with Plaintiff lasted twenty to thirty minutes. It is undisputed that, at that meeting, Hall questioned Plaintiff about the September 15, 2001 incident and that "Plaintiff felt like he had an opportunity to tell his side of the story." (J.A. at 269) Pending the completion of the investigation, Defendant placed Plaintiff on leave with pay beginning Monday, September 17, 2001.

Two days later, on September 19, 2001, Plant Manager Powers and Production Manager Hall arranged to meet Plaintiff and, at that time, gave Plaintiff a second chance to "tell his side of the story." Plaintiff again denied the allegations his subordinates lodged against him, but went on to say he would "move to third shift or take a demotion back to the assembly line." (J.A. at 271) Plaintiff further offered to apologize to his subordinates. Nevertheless, throughout the meeting, Plaintiff maintained he had done nothing wrong.

After this meeting, Powers and Hall met with Director of Operations Woodard to review the results of the investigation and their meetings with Plaintiff. They jointly decided to terminate Plaintiff's employment and, on Friday, September 21, 2001, Hall spoke with Plaintiff to inform him of their decision. Powers and Hall later indicated they did not believe Plaintiff had been forthcoming during the investigation. Defendant did not immediately replace Plaintiff and, for some time, the

first shift operated without a Team Leader. Ultimately, Defendant found it necessary to replace Plaintiff.[5]

Plaintiff adduced evidence that Michael Hughes, a white man temporarily working as a Team Leader for the second shift, had engaged in misconduct and that Defendant merely demoted Hughes. During Hughes' tenure, his subordinates lodged complaints directly with Defendant that Hughes was showing undue preference to his brother and to a female employee on his assembly line. As a result, Defendant launched an investigation into Hughes' performance. Defendant's managers spoke with the female Hughes allegedly preferred, who told them "nothing improper was going on" between the two. (J.A. at 281) When he spoke with Defendant's managers, Hughes did not deny giving preferential treatment to his brother.

As a part of the investigation of Hughes, Defendant took statements from workers on Hughes' assembly line. According to Defendant, there were no complaints of inappropriate language, verbal abuse, intimidation or threatening conduct on Hughes' part. However, Plaintiff proffered admissible evidence at the district court to the contrary. During Plaintiff's tenure as Team Leader, Production Manager Hall once asked Plaintiff to work on second shift for two weeks to assist Defendant in evaluating Hughes. At that time, Hughes' subordinates complained to Plaintiff, claiming Hughes cursed at employees on his line. Plaintiff told Hall about these complaints.

Additionally, Plaintiff produced a sworn affidavit from Terika Faux ("Faux"), one of Hughes' subordinates from his days as Team Leader. Therein, Faux stated that Hughes "would often use

---

[5]The record does not reflect who ultimately replaced Plaintiff on the *first* shift. However, it does show that as of November 2004, Quince Seay, an African-American, served as Team Leader of the *second* shift.

much harsher vulgarities [than 'damn'] which would be directed at" his subordinates, that she had complained routinely to management about Hughes' language, and that Hughes had "engaged in sexually explicit dancing with a woman on the plant floor" one time. (J.A. at 292) Faux further reported that, while three months pregnant, she confronted Hughes about a derogatory comment he made and Hughes responded: "If I wasn't a team leader, I'd knock the fuck right out of you." (J.A. at 293) Faux states she reported the incident to Plant Manager Powers and Production Manager Hall, and they promised to "handle it."[6] (*Id*.)

Additionally, Plaintiff produced a sworn affidavit from Terri Christian ("Christian"), another employee who occasionally worked on Hughes' team. According to Christian, Hughes "seemed to always speak in an abusive, overly-authoritative and derogatory manner to the employees he was supervising." (J.A. at 312) By way of example, Christian stated that Hughes once responded to a request for a bathroom break by saying "If you are not back in five minutes, I'll fuckin' write you

---

[6]During its investigation of Hughes, Defendant solicited a signed statement from Faux wherein she did not explicitly mention the incidents alleged in Plaintiff's sworn affidavit. She did, however, state "I hate coming in [sic] this place now – I get talked to like an idiot. Insults come from Michael." (J.A. at 154) Notably, Faux submitted her statement for the investigation into Hughes on March 28, 2001, while she avers the incident with Hughes threatening her while pregnant occurred in April or May 2001. (J.A. at 293) The affidavit submitted by Plaintiff asserts that Hughes remained in a supervisory capacity when he threatened Faux in April or May 2001. It is unclear from the record when, in fact, Defendant demoted Hughes.

The district court ruled part of Faux's affidavit – which referred to other employees' complaints about Hughes – inadmissible as Faux averred no personal knowledge. This represents only a small portion of Faux's affidavit, however, and the facts set forth above were properly admitted by the district court. As Defendant notes in its brief, Plaintiff does not challenge the district court's ruling excluding a small part of Faux's affidavit.

up."[7] (*Id*.) Defendant's account of its investigation into Hughes makes no mention of the allegations contained in either the Faux or Christian affidavits. Nevertheless, Defendant ultimately removed Hughes from his temporary assignment as Team Leader and placed him back on the assembly line.

**B.     Procedural History**

On August 25, 2003, Plaintiff filed a complaint alleging racial discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e and 42 U.S.C. § 1981. Therein, Plaintiff claimed that Defendant disciplined him more severely than a similarly situated white employee. Plaintiff sought declaratory judgment that Defendant violated Title VII and 42 U.S.C. § 1981, an Order directing Defendant to reinstate Plaintiff, and compensatory and punitive damages, among other things.

Following significant discovery, on November 9, 2004, Defendant filed a motion for summary judgment and a statement of undisputed material facts. Plaintiff responded to Defendant's motion, as well as its statement of undisputed material facts, on November 29, 2004. Subsequently, on January 6, 2005, Plaintiff filed a motion requesting that the court consider additional evidence in support of its response to Defendant's summary judgment motion. Ultimately, on July 27, 2005, the district court granted Defendant's motion for summary judgment.[8] In the same order, the district

---

[7]The district court also excluded a portion of Christian's affidavit for failing to meet the personal knowledge requirement of Fed. R. Civ. P. 56(e). The excluded portion of Christian's affidavit (Paragraph 6) also indicated other employees had complained about Hughes's offensive language and treatment. The facts set forth above were properly admitted by the district court, and Plaintiff does not challenge the exclusion of Paragraph 6.

[8]Although Plaintiff's complaint also alleges that Defendant created a racially hostile work environment, the district court found Plaintiff failed to sufficiently raise that claim. At any rate, Plaintiff does not again raise his hostile work environment claim on appeal and, therefore, waives

court granted in part and denied in part Plaintiff's motion to consider additional evidence. Plaintiff then filed his timely appeal before this Court.

## DISCUSSION

THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO DEFENDANT ON PLAINTIFF'S CLAIM OF RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT, 42 U.S.C. § 1981 and 42 U.S.C. § 2000e

### A.      Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Cotter v. Ajilon Services, Inc.*, 287 F.3d 593, 597 (6th Cir. 2002). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When presented with a motion for summary judgment, the court views the evidence and draws all reasonable inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In effect, "any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (internal citation omitted). The district court errs by granting summary judgment for the defendant where issues of credibility are determinative of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994).

To support a grant of summary judgment, the moving party "may . . . discharge[] [its initial burden] by 'showing' . . . that there is an absence of evidence to support the nonmoving party's

it.

case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has done this, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby, Inc.*, 477 U.S. at 252.

### B.      *McDonnell-Douglas* Framework

Title VII prohibits racial discrimination in employment. 42 U.S.C. § 2000e-2(a)(1) (2000); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973) ("Title VII tolerates no racial discrimination, subtle or otherwise."). An employee may establish a Title VII violation either by adducing direct evidence of discrimination, or by raising an inference of discrimination. *Talley v. Bravo Pitino Rest., L.T.D.*, 61 F.3d 1241, 1248 (6th Cir. 1995).

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court set forth the appropriate framework for reviewing claims of racial discrimination in the absence of direct evidence. First,

> [t]he complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802; *see also Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994). Alternatively, where a plaintiff cannot show the fourth element of the above inquiry, a plaintiff can make out a prima facie case by establishing that he is a member of a protected class, and "a comparable non-protected person was treated better." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582

(6th Cir. 1992). In that regard, plaintiff must proffer evidence that "for the same or similar conduct he was treated differently than similarly-situated non-minority employees." *Id.* at 583. A plaintiff that meets this initial burden effectively "creates a presumption that the employer unlawfully discriminated against" him. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Second, if a plaintiff makes this initial showing, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the allegedly discriminatory employment action. *McDonnell Douglas*, 411 U.S. at 802. Third and finally, once the defendant advances a legitimate reason for its employment action, the burden shifts back to the plaintiff "to demonstrate by competent evidence that the presumptively valid reasons for [the employment action] were in fact a coverup for a racially discriminatory decision." *Id.* at 805. In any case, the inquiry is fact-specific, and is intimately tied to the evidence adduced by the respective parties.

Applying the *McDonnell Douglas* framework to the case at bar, we find that the district court properly granted summary judgment to Defendant because, even drawing all inferences in Plaintiff's favor, he cannot show pretext. At the outset, we note that the district court's finding that Plaintiff established a prima facie case of discrimination under the *McDonnell-Douglas* framework is not challenged on appeal. Plaintiff does, however, challenge the district court's findings that Defendant proffered a legitimate, nondiscriminatory reason for his discharge, and that he failed to establish pretext.

The district court correctly found that Defendant put forth a legitimate, nondiscriminatory reason for the employment action. Notably, Defendant's burden is *not* to affirmatively "prov[e] absence of discriminatory motive." *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25

11

(1978). Rather, the defendant "must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Burdine*, 450 U.S. at 254-55 (internal citations omitted). Here, Defendant met its burden by asserting that it discharged Plaintiff for intimidating his subordinates, using offensive and inappropriate language in the workplace, falsifying time cards, and failing to deal with management in a forthright manner during their investigation. *See McDonnell Douglas*, 411 U.S. at 803 (an employee's "participation in unlawful conduct against" his employer constituted a legitimate, non-discriminatory reason for declining to rehire him); *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (employer met its burden "by asserting that plaintiff was discharged because he violated Rule 8 by manhandling [a] coworker"); *Mitchell*, 964 F.2d at 584 (employer articulated legitimate reason that employee misused its property); *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001) ("increasingly poor job performance" can constitute a legitimate nondiscriminatory reason).

We further find that, even viewing the evidence in the light most favorable to him, Plaintiff cannot establish pretext. To meet his burden on pretext, the plaintiff must produce evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason. *Manzer*, 29 F.3d at 1083 (citation omitted). Accordingly, the "plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002) (internal citations and quotation marks omitted). At this stage, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully

discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). Here, Plaintiff must disprove Defendant's proffered reason by a preponderance of the evidence. Additionally, Plaintiff must show that "discrimination was the real reason" for the adverse employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

A plaintiff can show pretext, first, by adducing "evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are factually false." *Manzer*, 29 F.3d at 1084 (internal citations and quotations omitted). Absent some substantiating evidence, a plaintiff's mere denial of "the defendant's articulated legitimate reason . . . is insufficient for a race discrimination claim to withstand a motion for summary judgment." *Mitchell*, 964 F.2d at 585 (citation omitted). However, even where a plaintiff can establish that the employer's actions were premised on a false or incomplete set of facts, he will not necessarily succeed in showing pretext. Where the employer honestly believes in the reason given for its employment action, a plaintiff cannot demonstrate pretext "simply because [the reason] is ultimately shown to be incorrect." *Majewski*, 274 F.3d at 1117 (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)). The employer can establish "honest belief" by showing its "reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith*, 155 F.3d at 807. "[T]he decisional process used by the employer [need not] be optimal [nor must it leave] no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* at 807.

In this case, Plaintiff cannot demonstrate pretext by showing the allegations against him were false. In its Response to Defendant's Summary Judgment Motion, Plaintiff argued Defendant's

proffered reason for discharging him had no basis in fact because, first, it was based on inadmissible hearsay and, second, Plaintiff denied falsifying time cards and threatening employees' jobs. The district court correctly held that the witness statements gathered by Defendant during its investigation were properly admissible and did not constitute hearsay evidence. The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. Defendant offered the statements not to prove their truth, however, but to demonstrate the state of mind and motive of Defendant's managers in discharging Plaintiff. *See King v. Tecumseh Pub. Sch.*, 229 F.3d 1152 (Table), 2000 WL 1256899, at *5 (6th Cir. July 13, 2000). The district court thus properly considered the witness statements. As to Plaintiff's second point, Plaintiff cannot rely on mere denials of Defendant's articulated reasons to show they had no basis in fact, but must produce some evidence in support of his denial to survive summary judgment. *See Mitchell*, 964 F.2d at 585. Plaintiff has failed to do so.

In any event, it appears that Defendant honestly believed in the reason advanced for discharging Plaintiff. Defendant conducted a thorough investigation into the September 15, 2001 incident, interviewing employees who were present, as well as the complainants. Pending completion of the investigation, Defendant placed Plaintiff on a temporary suspension. Plaintiff had an opportunity to meet with his supervisor and to render his account of the event. Indeed, Plaintiff received a second opportunity to explain the incident and speak in his defense a few days later.

Perhaps this investigation was less than "optimal," and conceivably it fell short in some respects, leaving "stone[s] unturned." *See Smith*, 155 F.3d at 807. However, Defendant's

investigation need not be perfect. Even viewing the evidence in the light most favorable to Plaintiff, Defendant took care to gather "particularized facts" about Plaintiff's conduct at work – both on September 15, 2001 and otherwise – and, reasonably relying on those facts, made a "considered decision" to discharge Plaintiff on that basis. *See id.* Moreover, as mentioned above, Plaintiff's mere denial of falsifying time cards and threatening employees' jobs does not alone suffice to save his case on summary judgment. *See Mitchell*, 964 F.2d at 585; *Majewski*, 274 F.3d at 1117. Thus, in light of Defendant's honest belief that Plaintiff used profane language in responding to subordinates, falsified time cards, and fostered a negative work environment for its employees, Plaintiff cannot satisfy his burden of showing pretext by proving the allegations about his work conduct false.

Secondly, a plaintiff can "admit[] the factual basis underlying the employer's proffered explanation and . . . that such conduct could motivate dismissal," but ultimately demonstrate pretext where "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a . . . coverup." *Manzer*, 29 F.3d at 1084. To show pretext in this fashion, "plaintiff may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of . . . discrimination." *Id.* Third, a plaintiff can also establish pretext by establishing the employer's reasons were insufficient to motivate the employment action. To do so, a plaintiff can adduce "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084. Inconsistency in an employer's explanation for such different treatment "raises an inference [of pretext] that must

be drawn, at summary judgment, in favor of the nonmovant." *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 468 (6th Cir. 2003). In a "close case" where both sides have adduced weighty evidence and the court cannot decide as a matter of law whether the employer's proffered reason is legitimate or pretextual, the issue must be submitted to a jury. *Johnson v. Kroger Co.*, 319 F.3d 858, 869 (6th Cir. 2003). On appeal, Plaintiff contends Defendant's proffered reasons "did not actually motivate it to *terminate* him because similar conduct did not motivate [Defendant] to terminate Hughes." (Reply Br. at 4)

In *Braithwaite*, this Court examined a case factually similar to the one at bar. In that case, the plaintiff and a coworker engaged in an altercation during working hours on the employer's property. *Braithwaite*, 258 F.3d at 491. Coworkers present at the time gave conflicting statements to the defendant in recounting the incident during employer's subsequent investigation: some described it as an exchange of words, while others reported plaintiff shoving his coworker. *Id.* at 491-92. The defendant's employee handbook specifically mandated discharge of employees found to "strik[e] or manhandl[e] another person." *Id.* at 490. The handbook further made discharge permissible for threats to coworkers. *Id.* After reviewing witness statements and determining plaintiff had violated both rules, defendant discharged the plaintiff. *Id.* at 492. The plaintiff brought suit alleging racial discrimination in violation of Title VII, and attempted to establish pretext by arguing that several other employees who violated the employer's rules by threatening others had not been discharged. *Id.* at 497. There, however, the Court found the others were not similarly situated to plaintiff since plaintiff had violated two company rules – the rule prohibiting threats to

others, and the rule against manhandling coworkers (which, incidentally, made discharge mandatory). *Id*.

Even viewing the evidence in the light most favorable to him, Plaintiff cannot succeed in showing pretext via the second or third methods. Plaintiff fails to raise a question of fact whether Defendant treated him differently than Hughes for "substantially identical conduct." To some extent, Plaintiff relies on his "subjective belief" that his conduct can be equated with Hughes' conduct. *See Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 660 (6th Cir. 1999). In fact, only some of their conduct was similar. *See Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 730 (6th Cir. 1999) (where only "*some*" conduct was similar, plaintiff does not remotely establish comparably serious conduct). Perhaps the two engaged in substantially identical conduct in speaking offensively towards their subordinates or in treating those subordinates with disrespect, but the witness statements adduced by Defendant show that Plaintiff routinely falsified his subordinates' time cards. In addition, Plaintiff's subordinates were requesting transfers – at first for "personal reasons," and later openly, because they wanted to avoid working with Plaintiff. (J.A. at 262) Comparably, the Faux and Christian affidavits do *not* support a finding that Hughes falsified time cards, or that his subordinates had asked to be transferred. Moreover, Plaintiff's subjective belief that Hughes' preferential treatment of his brother and a woman on the line somehow makes their conduct substantially identical is untenable.

Like the plaintiff in *Braithwaite*, Plaintiff relies on a comparison with an employee who cannot be described as "similarly situated" in all relevant respects. The mere fact that subordinates did not want to work with Plaintiff is relevant to Defendant's different disciplinary decisions.

Defendant's concern for retaining its employees and avoiding the need to reschedule multiple workers pursuant to these requests could be viewed as a "mitigating circumstance" preventing comparison of Defendant's conduct to Hughes' arguably similar conduct. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) (finding concern about plant safety constitutes "a 'mitigating circumstance' that prevents any comparison"). Title VII "was not intended to 'diminish traditional management prerogatives,'" *Burdine*, 450 U.S. at 259, and this "Court cannot sit as a 'super-personnel department.'" *Young v. Sabbatine*, 238 F.3d 426, 2000 WL 1888672, at \*6 (6th Cir. Dec. 19, 2000). Consequently, we conclude that the evidence in this case – even when viewed in the light most favorable to Plaintiff – fails to support a finding that Defendant's articulated reason for discharging Plaintiff was mere pretext for discrimination.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order granting summary judgment to Defendant on Plaintiff's claim of racial discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e and 42 U.S.C. § 1981.