*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0288p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SHONTA MICHAEL,

        *Plaintiff-Appellant,*

    *v.*

No. 06-5750

CATERPILLAR FINANCIAL SERVICES CORPORATION,

        *Defendant-Appellee.*

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 05-00177—Aleta A. Trauger, District Judge.

Argued: June 7, 2007

Decided and Filed: July 31, 2007

Before: CLAY, GILMAN, and McKEAGUE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Bradley W. Eskins, ESKINS KING, Memphis, Tennessee, for Appellant. Joseph S. Turner, SEYFARTH SHAW LLP, Chicago, Illinois, for Appellee. **ON BRIEF:** Michael C. Skouteris, SKOUTERIS & MAGEE, PLLC, Memphis, Tennessee, for Appellant. Joseph S. Turner, Jason M. Torres, SEYFARTH SHAW LLP, Chicago, Illinois, for Appellee.

---

**OPINION**

---

    RONALD LEE GILMAN, Circuit Judge. Shonta Michael, an African-American employee of Caterpillar Financial Services Corporation, filed this employment-related action arising out of a disciplinary episode that began in late January of 2004. At that time, Caterpillar management placed Michael on a 90-day performance plan in response to various complaints lodged against her. Michael alleges that Caterpillar (1) discriminated against her by taking disciplinary action based on unfounded complaints, (2) retaliated against her for raising complaints of her own, and (3) created a racially hostile work environment. The district court granted summary judgment in favor of Caterpillar regarding all of Michael's claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

1

## I. BACKGROUND

### A.     Factual background

This case arises primarily from a conflict that Michael experienced with a manager at Caterpillar named Patricia Henry, who had recently replaced Michael's prior manager, Holly Tomlinson. Henry and Caterpillar insist that the conflict and subsequent disciplinary measures came about solely because of issues with Michael's performance, whereas Michael asserts that Caterpillar engaged in race-based discrimination, retaliation, and harassment.

Michael began working for Caterpillar in August of 1997, just after graduating from college. In September of 2003, she accepted a transfer from Caterpillar's Peoria, Illinois office to its Nashville, Tennessee facility to become an asset manager in the accounting department. Her new position required her to supervise two other employees: James Gooden, a Caucasian, and Pam McGhee, an African-American. Adrena Holland, an African-American, later replaced McGhee as a temporary employee during McGhee's maternity leave. Similarly, Tomlinson initially served as Michael's immediate supervisor, but she was subsequently replaced by Henry, another cost-accounting manager, effective January 13, 2004. Both Tomlinson and Henry reported directly to Financial Accounting Manager Diane Rezaii. Tomlinson, Henry, and Rezaii are all Caucasian.

On or around December 13, 2003, Rezaii held a meeting with Henry, Tomlinson, and Michael to discuss the status of work in the accounting department. Rezaii claims that Michael arrived late to this meeting; Michael responds by saying only that she cannot recall the meeting.

#### 1.     *Michael's performance evaluation*

On January 8, 2004, Michael met with Tomlinson to review a written performance evaluation of Michael. The evaluation generally rated her quite favorably. It noted that "[s]he seems to have a good report [sic] with her staff," but also listed "developing others" and "managing performance" as an "opportunity for development" rather than a "strength." At the same meeting, Michael received an "Eye on Quality Award" worth $50 that recognized her for excelling in "customer service" and for the qualities of "responsibility," "care for others," and "exceeding expectations." Although Tomlinson asserts that she informed Michael during the meeting that she needed to do a better job of attending meetings on time, Michael disputes that this occurred.

Following this performance review, a second meeting among Michael, Henry, and Rezaii was held on January 14, 2004. Both Henry and Razaii claim that Michael was again late to the meeting, but this is disputed by Michael.

#### 2.     *Michael's absence and Gooden's complaint, both on January 16*

Michael admits that on January 16, 2004 she worked from home rather than coming in to her office in Nashville. She had allegedly worked late the previous night and then woke up early the next morning, all in order to complete a time-sensitive year-end report that she had been assigned to produce. According to Michael, Tomlinson had implicitly authorized her to work from home by stating the she should "do what she had to do" to complete the report. Michael conceded in her deposition, however, that Tomlinson had not specifically authorized her to work from home that day, saying that "[s]he never gave me direct authorization, not in those words."

During the course of that day, Michael's online calendar listed her as "busy." She responded to emails from Henry, but did not disclose that she was working from home. According to Michael, she began working from home early in the morning, and continued working and sending emails until 2:00 or 3:00 p.m. After realizing at some point during the day that Michael was not in the office,

Henry contacted Tomlinson to ask whether she had given Michael permission to work from home. Tomlinson informed Henry that she had not given Michael such authorization.

Also on January 16, 2004, Gooden, one of Michael's subordinates, complained about Michael's management style to Rezaii. According to Rezaii, Gooden asserted that he felt degraded by Michael because she would make him perform personal errands such as bringing her water, retrieving paper off the printer, or picking up lunch for Michael at Captain D's restaurant. Michael disputes the substance of the allegations, but she does not contest the fact that Gooden indeed lodged a complaint. Gooden also complained to Rezaii that Michael made a practice of calling McGhee and Holland, Michael's other two subordinates, at home—sometimes as early as 5:00 a.m. Michael does not deny this specifically, but objects to the allegation as hearsay. When asked in her deposition if she felt that calling a subordinate at home at that hour of the morning was reasonable, she replied that it was. Rezaii relayed Gooden's concerns over Michael's management both to Henry and to Senior Human Resources Generalist Jackie Sweeney, who said that she would investigate the complaints.

### 3.          *January 20 meeting between Michael and Henry*

Caterpillar employees observed the Martin Luther King, Jr. holiday on January 19, 2004, so the next working day after January 16 fell on January 20. The events of that day are the basis for the bulk of Michael's claims. On the morning of January 20, Henry scheduled an 11:00 a.m. meeting with Michael. Henry asserts that one of the purposes of the meeting was to discuss Michael's unauthorized absence on January 16, but Michael disputes this, stating that her understanding was that the meeting was solely to discuss business-related matters. Michael acknowledges that, at 11:05 a.m., she had not yet arrived at Henry's office for their scheduled meeting. Instead, Henry located Michael at another meeting that had run over. Henry asked Michael at that point when she planned to arrive for their 11:00 a.m. meeting. According to Michael, Henry voiced this inquiry "in a very aggressive tone" that "rudely interrupted" the meeting Michael was then attending. Michael replied that she would meet with Henry in five minutes. McGhee and Holland, who saw Henry looking for Michael, reported that Henry appeared angry at the time.

Michael testified in her deposition that she arrived at Henry's office at approximately 11:15 a.m. What transpired next is the subject of dispute between the parties. Michael asserts that she began the meeting by apologizing for being late, but that "Ms. Henry became very aggressive, started saying yeah yeah you are going to be sorry . . . then pointed a finger in Ms. Michael's face and got so close to Ms. Michael that she could smell the nicotine from her cigarettes on her breath." According to Michael, Henry then "started jumping up and down in her chair saying you are going to pay no matter what."

At that point, Michael allegedly told Henry that she did not feel comfortable in the meeting and requested that a third party from human resources be called to join them. Henry purportedly complied with this request by contacting Sweeney, but was only able to leave a message for her. Michael testified in her deposition that she then left the room because she "felt threatened, felt like Ms. Henry wanted to physically harm her, felt nervous and uncomfortable."

Henry's account of the meeting differs significantly. She asserts that Michael was the aggressor, raising her voice during the meeting, refusing to answer questions, slapping her hand on Henry's desk, interrupting Henry, and criticizing her management skills.

Following the meeting, both Michael and Henry contacted Caterpillar's human resources department. Michael lodged a complaint describing Henry's behavior as noted above, but made no mention of any race-based discriminatory animus. Henry, too, proceeded directly to human resources and reported what she viewed as Michael's inappropriate behavior.

## 4.       *Sweeney's investigation*

At some point on January 20, 2004, Sweeney began investigating both Michael's and Henry's separate complaints regarding the confrontational meeting, as well as Gooden's earlier complaint concerning Michael's management style.  Among those interviewed by Sweeney was a Caterpillar employee named John Jubert, who sat two cubicles away from Henry's office.  Jubert told Sweeney that Michael was standing and screaming during the meeting, and that, at one point, he thought Michael might physically strike Henry.  He also reported to Sweeney that Henry calmly asked Michael to leave her office on several occasions, but that Michael refused and continued to scream at Henry.  Michael disputes this account as reported by Sweeney, and objects to it as hearsay. None of the other employees seated near Henry's office professed any knowledge of the meeting.

Sweeney's investigation of Gooden's complaint about Michael included interviews with all of Michael's subordinates.  McGhee, one such subordinate, informed Sweeney that Michael was very demanding and would call her throughout the day, which made it difficult for McGhee to complete her tasks.  She said that she had heard of Michael asking others to perform personal tasks, but that she had never been so asked.  Holland, another of Michael's subordinates, reported to Sweeney that she had never been managed in the way that Michael managed her, and that she was ready to quit because of the pressure Michael placed on her.  Michael objects to both of these statements as hearsay evidence.

In addition to interviewing Michael's subordinates, Sweeney spoke with other Caterpillar employees regarding their interactions with Michael.  Steve Elsesser, the controller for the Nashville office, informed Sweeney that Michael had been a "challenge" to work with because she was frequently late to meetings, sometimes interrupted others during meetings, and had difficulty completing tasks on time.  Sweeney also spoke with Roland Moseley, a business and asset manager in the accounting department, who noted that Michael failed to attend several scheduled training sessions and that, when she did attend, she often arrived late.

The next day, January 21, 2004, Michael met separately with both Rezaii and Elsesser.  She expressed to both her belief that Henry had mistreated her, but according to Rezaii and Elsesser, Michael did not specifically assert that she had been discriminated against.  Michael claims in response only that she "tried" to tell both about Henry's "discriminatory type of behavior," but was unable to do so.  On or about January 22, 2004, Michael also spoke with Human Resources Specialist Carla Alexander and specifically alleged that Henry's conduct was racially motivated.

## 5.       *Disciplinary actions*

Michael met with Rezaii and Sweeney on January 22, 2004.  During the meeting, Rezaii explained that both the human resources department and upper management were still investigating the situation and were considering their options.  Rezaii said that these options included termination, adding that Michael "should be happy to have a job."  Michael was told to take paid administrative leave pending the investigation and to report for work on Monday.  Rezaii also asked Michael to return her company-issued laptop computer.

The following Monday, January 26, 2004, Michael again met with Rezaii and Sweeney.  At this second meeting, Rezaii explained to Michael that she had the option of either staying at her current position and being placed on a 90-day "Step 1 Performance Plan" or accepting a lateral assignment to a different position that involved the same pay and benefits.  Michael notified Rezaii by email on Wednesday, January 28 that she would accept the first option and stay in her current position on a 90-day performance plan.

Michael next met with Rezaii and Henry on Thursday, January 29, 2004 to discuss her performance plan.  The performance plan identified seven areas in which Michael needed to improve

over the following 90 days, including notifying management if she would not be in the office, improving her timely attendance at business meetings, refraining from treating her staff as personal assistants, and refraining from contacting her staff outside of normal business hours.

According to the plan, Henry and Michael were scheduled to meet on a weekly basis so that Henry could track Michael's progress. Michael's performance in the targeted areas would be reviewed and, if significant improvement was not shown, further disciplinary action could occur. Michael characterizes Henry's actions in reviewing her performance during this period as "undermining her authority by going behind her back and asking her employees' [sic] questions regarding Ms. Michael's performance." This conduct prompted Michael to file an additional complaint against Henry with the human resources department.

### 6.    *Caterpillar's reorganization and Michael's transfer*

Michael successfully completed the performance plan in April of 2004. In June of 2004, Caterpillar reorganized its information technology (IT) department. As a result of the reorganization, Michael retained many of her duties, but was no longer responsible for IT asset management. This meant that she no longer supervised any subordinates. Her job title changed from Business and Asset Manager to Financial Analyst, but her salary and benefits remained the same.

Also in June of 2004, Henry contacted Michael to inform her that a manager at Caterpillar's facility in Griffin, Georgia had specifically asked about the possibility of Michael transferring there. Michael stated in her deposition that she was "surprised" and "happy" to receive this news. She accepted the offer and transferred to Georgia to become an engineering staff accountant with a 3% pay increase. Approximately one year later, Michael was promoted to the position of accounting supervisor. She now earns a significantly higher salary than she did in Nashville.

Michael asserts that the stress caused by the allegedly discriminatory employment situation in Nashville played a role in her subsequent breakup with her boyfriend, caused her to miscarry her child, and resulted in post-traumatic stress disorder. She also contends that, as a result of Caterpillar's actions, she has experienced sleepless nights, hair loss, weight loss, and a personality change.

## B.    Procedural background

Michael filed a complaint with the Equal Employment Opportunity Commission (EEOC) on January 23, 2004, the day after she was placed on paid administrative leave, alleging that Caterpillar had discriminated against her. The EEOC investigated her claim and, in September of 2004, mailed a Notice of Determination to Michael, concluding that a hostile work environment existed at Caterpillar for black employees, and that Michael was treated less favorably than other managers facing complaints lodged by subordinates. In December of 2004, after failing to reach an agreement between the parties, the EEOC issued Michael a "right-to-sue" letter.

Michael filed the present action in March of 2005. Her complaint alleges that Caterpillar racially discriminated against her, retaliated against her because of the complaints that she had filed, and created a hostile work environment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; § 1981 of the Civil Rights Act of 1991, 42 U.S.C. § 1981; and the Tennessee Human Rights Act (THRA), Tenn. Code. Ann. § 4-21-101, et seq. The district court granted summary judgment in favor of Caterpillar on all of Michael's claims. This timely appeal followed.

## II.  ANALYSIS

### A.       Standard of review

We review a district court's grant of summary judgment de novo.  *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006).  Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.       Racial discrimination

In the absence of direct evidence of racial discrimination, Michael presented her circumstantial evidence through the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Michael bears the initial burden under that framework of demonstrating the prima facie elements of her Title VII claim.  *Carter v. University of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) (assuming that the plaintiff had met her initial burden by establishing a prima facie case for her Title VII race-discrimination claim).  If she succeeds, this "creates a rebuttable presumption of discrimination, and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the challenged employment action."  *Id.*  Only if Caterpillar meets this obligation does the burden shift back to the Michael to "then prove that the proffered reason was actually a pretext to hide unlawful discrimination."  *See id.*

The burden-shifting framework applies to all of Michael's statutory causes of action under Title VII, § 1981, and the THRA.  *See Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001) (applying the *McDonnell Douglas* framework to claims under these three acts).  In order to establish a prima facie case, Michael must show that she (1) is a member of a protected group, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) was replaced by a person outside of the protected class or was treated differently from similarly situated members of the unprotected class.  *See Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 728-29 (6th Cir. 1999).

The district court determined that Michael's race-discrimination claim failed on the ground that she had not raised a genuine issue of material fact as to whether she had suffered an adverse employment action.  An adverse employment action in the context of a Title VII discrimination claim is a "materially adverse change in the terms or conditions of employment because of the employer's actions."  *Allen v. Michigan Dept. of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999) (quotation marks omitted).

In the recent case of *Burlington Northern and Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2415 (2006), the Supreme Court expanded this court's prior definition of a "materially adverse employment action" in the context of a retaliation claim.  The Court in *Burlington Northern* went to great lengths, however, to distinguish both the text and purpose of Title VII's anti-retaliation provision (§ 704(a)) from its anti-discrimination provision (§ 703(a)).  *Id.* at 2411-13 (concluding that "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment").  Consequently, *Burlington Northern* did not alter this court's understanding of a materially adverse employment action in the § 703(a) anti-discrimination context.  *See, e.g.*, *Watson v. City of Cleveland*, 202 F. App'x 844, 853-55 (6th Cir. 2006) (analyzing an employee's discrimination claim under the standard formulation of a materially adverse employment action, but applying *Burlington Northern*'s expanded definition to

the employee's retaliation claim).  As set forth in *Ford v. General Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002),

> [a] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

Most of Caterpillar's alleged actions against Michael fall outside of this definition.  The initial confrontation between Michael and Henry, in which harsh words were exchanged, does not amount to a materially adverse action.  *See Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (holding that a "contentious oral confrontation" involving "stern words" did not amount to harassment, let alone to a materially adverse employment action).  Nor did the requirement that Michael turn in her laptop computer or her brief placement on paid administrative leave constitute materially adverse actions.  *See, e.g.*, *Adair v. Charter County of Wayne*, 452 F.3d 482, 490 (6th Cir. 2006) (requiring police officers to turn in their pagers is not an adverse employment action), *cert. denied*, 127 S. Ct. 1828 (2007); *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (holding that an employee's placement on paid administrative leave pending the outcome of an investigation is not an adverse employment action).

Of all the actions that Michael alleges, her placement on a 90-day performance plan after she had returned from administrative leave comes the closest to meeting the above definition of a materially adverse employment action.  Although the plan was temporary and Michael completed it successfully, this court has previously rejected the rule that only "ultimate employment decisions," such as hirings, firings, promotions, and demotions, can be materially adverse for the purpose of a Title VII retaliation or discrimination claim.  *See White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 801 (6th Cir. 2004) (en banc) (holding that an employee's suspension without pay for over a month was materially adverse for the purpose of her retaliation claim even though she was later restored to her position with back pay, and reasoning that the same standard should apply to both retaliation and discrimination claims), *aff'd on other grounds*, 126 S. Ct. at 2415 (ruling that an even lower standard for material adversity applies in the context of retaliation claims). *But cf. Agnew v. BASF Corp.*, 286 F.3d 307, 310-11 (6th Cir. 2002) (determining, in the context of a state-law discrimination case employing the *McDonnell-Douglas* framework, that placement on a performance-improvement plan did not constitute a constructive discharge and thus was not an adverse employment action for the purpose of establishing a prima facie case of discrimination).

The specifics of Michael's performance plan create significant doubt about whether it was in fact materially adverse.  Indeed, most of the plan requirements simply called for Michael to refrain from engaging in certain unreasonable practices, such as treating her subordinates like personal assistants, calling them at home outside of normal business hours, and failing to notify her supervisors when she would be out of the office for the day.  The plan did not otherwise significantly alter Michael's responsibilities, pay, or work hours, although it did entail monitoring her compliance.  *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (reaffirming that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims").

Ultimately, however, we need not decide whether Michael's performance plan constituted a materially adverse action in the context of her discrimination claim.  As addressed in Part II.C.2. below, even assuming that the performance plan constituted a materially adverse action and that Michael established the remaining elements of a prima facie discrimination case, she has failed to raise a genuine issue of material fact concerning whether Caterpillar's proffered legitimate reasons

for the various disciplinary actions taken against her were a pretext to mask either unlawful discrimination or retaliation.

## C.    Retaliation

Michael's second claim asserts that Caterpillar retaliated against her for complaining that the discipline she received was based on her race. She first complained about Henry's behavior to Caterpillar's human resources department on January 20, 2004. At that time, she did not specifically state her belief that Caterpillar's actions were motivated by race. On or about January 22, however, she indisputably asserted at another meeting with the department her belief that the treatment she received *was* racially motivated. The following day, on January 23, she filed an EEOC complaint against Caterpillar in which she again alleged racism. We therefore conclude, viewing the facts in the light most favorable to Michael, that Caterpillar was aware of Michael's protected complaints of racism no later than January 22, 2004.

The prima facie elements of a retaliation claim are similar but distinct from those of a discrimination claim. To establish her prima facie case, Michael must show that

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (emphasis omitted). As noted above, the Supreme Court recently held that a plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context. *Burlington Northern*, 126 S. Ct. at 2415. A materially adverse employment action in the retaliation context consists of any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. (quotation marks omitted).

This more liberal definition permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context. *See, e.g.*, *id*. at 2415-16 (noting that a supervisor's failure to invite an employee to lunch could, under certain circumstances, amount to materially adverse retaliation action); *Halfacre v. Home Depot, U.S.A., Inc*., 221 F. App'x 424, 432 (6th Cir. 2007) (remanding for reconsideration, in light of *Burlington Northern*, whether assigning the plaintiff a poor performance-evaluation score constituted an adverse employment action for the purpose of setting forth a retaliation claim). The retaliatory actions alleged by Michael, including her brief placement on paid administrative leave and the 90-day performance plan, appear to meet this relatively low bar.

This leaves only the requisite fourth and final element of a prima facie case—showing a causal connection. "To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (quotation marks omitted). "Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." *Randolph v. Ohio Dep't of Youth Servs*., 453 F.3d 724, 737 (6th Cir. 2006).

Michael's best argument for a causal connection between the adverse actions she alleged and the internal complaint she filed with Caterpillar's human resources department relies on (1) the two-day proximity between her initial complaint and Caterpillar's instigation of disciplinary action, (2) the fact that she had recently received a positive evaluation and an award indicating better-than-satisfactory job performance, (3) the fact that Henry, who also was the subject of a complaint,

suffered no disciplinary action, and (4) Michael's claim that Caterpillar violated an internal company policy by taking disciplinary action against her without first providing her written notice of the underlying complaints. These facts, in our opinion, are sufficient to satisfy the final element of causation. Consequently, we conclude that Michael established a prima facie case for her retaliation claim. We nonetheless conclude that her retaliation claim fails because Caterpillar has shown legitimate, nonretaliatory reasons for its actions, which Michael has been unable to rebut with proof that raises a genuine issue of material fact as to whether those reasons were pretextual. Caterpillar's actions and its proffered nondiscriminatory explanations are more fully analyzed below.

### 1.        *Michael's placement on paid administrative leave*

As mentioned above, Michael attended a meeting with Rezaii and Sweeney on January 22, 2004, at which time Michael was placed on two days of paid administrative leave and was required to turn in her laptop computer. Rezaii explained in her deposition that this action was taken due to the pending investigation of the complaints by both Gooden and Henry concerning Michael's management style and professionalism. This proffered explanation finds strong support in the record. First, Michael concedes that Sweeney was, in fact, investigating several complaints against Michael at that time. Rezaii would clearly have known of the complaints against Michael and the pending investigation at the time of Michael's suspension because Gooden had complained directly to Rezaii, Rezaii had spoken with Henry, and Rezaii had directed Sweeney to begin an investigation.

Because Caterpillar articulated legitimate, nondiscriminatory reasons for imposing the challenged disciplinary action, the burden shifted to Michael to demonstrate that Caterpillar's proffered reasons were actually a pretext to hide unlawful retaliation. *See Carter*, 349 F.3d at 273. "To meet [her] burden on pretext, the plaintiff must produce evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason." *Haughton v. Orchid Automation*, 206 F. App'x 524, 531 (6th Cir. 2006). Michael "can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

Michael essentially concedes the basis in fact for Caterpillar's actions—Sweeney's then-pending investigation of the various complaints against Michael. Regarding whether the pending investigation was sufficient to warrant Michael's brief placement on paid leave, this court has upheld the employer's action in numerous cases in which employees have been placed on paid leave pending investigations of complaints against them. *See, e.g.*, *Scott v. Metro. Health Corp.*, Nos. 05-1948, 05-2642, 06-1122, & 06-1652, 2007 WL 1028853, at \*5 (6th Cir. Apr. 3, 2007) (holding that an employee's placement on paid administrative leave pending an investigation did not amount to retaliation); *Peltier v. United States*, 388 F.3d 984, 988-89 (6th Cir. 2004) (concluding that the placement of an employee on paid leave during a pending investigation, even if adverse, was not pretextual).

No genuine issue of material fact arises in connection with Michael's placement on leave because Caterpillar's proffered reason, as expressed by Rezaii in her deposition, focused solely on the *pending investigation* of the accusations raised against Michael, not the *results* thereof. Rezaii explained that placing Michael on leave was necessary to avert any potential retaliation by Michael against Gooden, her subordinate who had lodged the complaints that initiated the investigation.

Michael asserts two principal courterarguments aimed at establishing that Caterpillar's proffered justification for placing her on administrative leave was pretextual: (1) her recent positive performance review, and (2) the fact that Caterpillar did not similarly place Henry on paid leave despite Michael's complaint against her. Michael's positive performance review, however, occurred *prior to* the events that Caterpillar proffers as justification for placing Michael on leave. That

review, therefore, could not have encompassed the events primarily at issue. This leaves to be explained the justification for Caterpillar's treatment of the accusations against Michael in light of its nonreaction to her accusations against Henry.

On this latter point, Rezaii correctly pointed out in her deposition that the nature and extent of the complaints that Gooden and Henry filed against Michael differed from Michael's complaint against Henry. Rezaii, at the time of the January 22, 2004 meeting, was aware that Michael (1) worked from home on January 16 without prior notification, (2) had been accused by Gooden of managing her subordinates in a degrading manner by calling them at odd hours and having them perform personal tasks, and (3) had been accused by Henry of showing up late as well as acting inappropriately and insubordinately at a meeting held to discuss the above matters. Sweeney, who also attended the meeting at which Michael was placed on paid leave, had begun her investigation and had already substantiated some of the allegations concerning Michael's management problems.

The only allegations against Henry, in contrast, came from Michael—herself the subject of several pending complaints—and involved just one incident in which Henry had allegedly berated Michael after she had shown up late for a meeting. Furthermore, given that Michael was to be placed on administrative leave, no concerns of retaliation by Henry against Michael would require placing Henry on leave as well during the investigation. Even drawing all inferences in favor of Michael, these significantly different circumstances fully rebut Michael's argument that Caterpillar's failure to place Henry on leave demonstrates that its proffered justification for placing Michael on leave was pretextual.

### 2.          *Michael's 90-day performance plan and related monitoring*

Michael also argues that, following her return from administrative leave, Caterpillar's imposition of a 90-day performance plan and its monitoring of her pursuant to the plan amounted to retaliation. On January 26, 2004, Michael met with Rezaii and Sweeney to discuss Michael's disciplinary options. They informed Michael that she could either accept placement on a 90-day performance plan and continue in her current position or reject the plan and relinquish her managerial responsibilities.

After electing to accept the performance plan, Michael met again with Rezaii and Sweeney to go over the performance plan on January 29. Michael asserts that the proffered grounds for imposing the performance plan were "baseless" and that the plan was instead imposed as a form of retaliation for the complaints that she had filed. She also alleges that Henry improperly monitored her work performance during the plan period. Because monitoring was part and parcel of the performance plan, however, this allegation does not constitute a separate disciplinary action. Caterpillar's proffered reason for imposing the performance plan was not simply the pending complaints against Michael, but was also based on what had been uncovered as a result of Sweeney's investigation. In other words, Caterpillar asserts that it "investigated those complaints and took action consistent with its investigation."

We initially note that Michael's principal objection to many of the investigative findings was that they were based on hearsay. As this court recently explained under similar circumstances, however, witness statements contained in an investigative report may be considered on summary judgment "not to prove their truth, . . . but to demonstrate the state of mind and motive of Defendant's managers in discharging Plaintiff." *Haughton*, 206 F. App'x at 532.

Furthermore, Michael's disagreement with the facts uncovered in Caterpillar's investigation does not create a genuine issue of material fact that would defeat summary judgment "as long as an employer has an honest belief in its proffered nondiscriminatory reason." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). The key inquiry in assessing whether

an employer holds such an honest belief is "whether the employer made a reasonably informed and considered decision before taking" the complained-of action. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). An employer has an honest belief in its rationale when it "reasonably relied on the particularized facts that were before it at the time the decision was made." *Majewski*, 274 F.3d at 1117 (citation and quotation marks omitted). "[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith*, 155 F.3d at 807.

As part of her investigation, Sweeney interviewed Michael's subordinates, other Caterpillar employees with whom Michael worked, and those employees who might have overheard Michael's January 20, 2004 confrontation with Henry. Sweeney's investigation revealed that many of Michael's coworkers, including Elsesser, Holland, McGhee, Moseley, and Rezaii, found Michael difficult to work with and often tardy. Although Michael points out that Gooden's specific accusations that she required her subordinates to perform personal tasks was never corroborated, the investigation nevertheless pointed to other serious issues with Michael's management style.

Sweeney's investigation of the initial confrontation between Henry and Michael also revealed additional questions regarding Michael's professionalism. The only independent witness to the exchange reported that Michael was "screaming" at Henry, that she refused to leave Henry's office, and that her actions were so aggressive that the witness was concerned that Michael might physically assault Henry. On top of these reports, Michael concedes that she worked from home on January 16, 2004 without notifying any of her supervisors that she would not be in the office that day, and that she arrived late to her meeting with Henry on January 20, 2004.

Because Caterpillar proffered these legitimate, nondiscriminatory reasons for imposing the performance plan, the burden shifted to Michael to raise a genuine issue of material fact as to whether Caterpillar's reasons were actually a pretext designed to mask unlawful discrimination. *See Carter*, 349 F.3d at 273. Michael again points to her positive performance review just weeks before the January 20, 2004 incident and the fact that Caterpillar did not similarly discipline Henry as a result of Michael's accusations agasint her. For the same reasons outlined above, however, these arguments fail to establish pretext under the circumstances. Michael also raises factual objections to the job-performance concerns mentioned in Caterpillar's investigation, but she cannot defeat Caterpillar's honest belief in her performance deficiencies simply through her own contrary assertions. *See Majewski*, 274 F.3d at 1117.

Michael's only contention that calls into question Caterpillar's honest belief in its proffered justification for her performance plan derives from Rezaii's deposition testimony. Rezaii initially stated that she could not recall the results of Sweeney's investigation, but then later said that she believed that the investigation had boiled down to "he said/she said," with no real findings. The extensive documented results of Sweeney's investigation, however, refute this. Moreover, Sweeney herself attended the meetings at which Michael was disciplined, and the human resources department—not Rezaii—put together Michael's performance plan. Sweeney's supervisor, Human Resource Manager Gari Cowan, also stated in her deposition that Sweeney's investigation pointed to issues with Michael's management style and indicated that Michael's was the only voice raised during her January 20, 2004 confrontation with Henry. Even if Rezaii was unaware of these findings at the time Michael's performance plan was imposed, she was aware of Gooden's complaint because he had come directly to her, and she was also aware of Michael's January 16, 2004 absence from work.

The above analysis demonstrates that Caterpillar presented sound, nondiscriminatory reasons for the action that it took based on a reasonable investigation of events that occurred after Michael's favorable performance review. We therefore find no error in the district court's grant of summary judgment regarding Michael's retaliation claim because she was unable to raise a genuine issue of material fact as to whether Caterpillar's proffered legitimate explanation was pretextual.

**D.       Hostile work environment**

Michael's final claim asserts that Caterpillar's actions created a hostile work environment. To establish a hostile-work-environment claim, Michael must show that "(1) she was a member of a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based upon the employee's protected status, such as race or gender, (4) the harassment affected a term, condition, or privilege of employment, and (5) the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventive actions." *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 605 (6th Cir. 2002), *abrogated on other grounds by White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232 (6th Cir. 2005). Actionable harassment arises where "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (alterations in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

In accordance with these elements, a hostile-work-environment claim is cognizable only if the purported harassment, viewed in conjunction with all of the circumstances, occurred because of the employee's protected status. *Farmer*, 295 F.3d at 605; *see also Jackson v. Quanex Corp.*, 191 F.3d 647, 661-62 (6th Cir. 1999) (examining the "totality of the circumstances" and explaining that "even though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact that the plaintiff was African American").

Michael's hostile-work-environment claim arises out of the same treatment that she points to with respect to her retaliation claim, with the addition of Henry's alleged conduct at the January 20, 2004 meeting. (This meeting occurred before Michael had filed any complaints, and therefore could not be part of her retaliation claim.) Both claims suffer from the same problem: Caterpillar has demonstrated an honest belief in the nondiscriminatory explanation that it offered for its actions that Michael has failed to rebut.

Regarding the January 20 meeting, Sweeney's investigation largely corroborated Henry's account that Michael—not Henry—acted inappropriately. Moreover, regardless of whether a shouting match broke out at the meeting and whether Michael started it, federal courts are generally not in the business of refereeing such common workplace conflicts. *See, e.g.*, *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994) (noting that federal law "does not guarantee a utopian workplace or even a pleasant one. . . . [P]ersonality conflicts between employees are not the business of the federal courts.").

Michael ultimately failed to show that the alleged harassment was "severe or pervasive." *See Harris*, 510 U.S. at 21. She instead admits that no one at Caterpillar ever made overtly racist remarks or threats to her, that Henry never raised her voice or made a threat apart from what allegedly took place at the January 20, 2004 meeting, and that the only "harassment" she experienced was the imposition of the disciplinary action taken against her. We therefore conclude that Michael has failed to raise a genuine issue of material fact that would support her hostile-work-environment claim.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.