NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0547n.06

No. 12-5708

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
***Jun 04, 2013***
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ARCHIE M. DONALD, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| BUCKMAN LABORATORIES, | ) | |
| INC., | ) | |
| | ) | **O P I N I O N** |
| **Defendant-Appellee.** | ) | |
| | ) | |

Before:  BOGGS, MOORE, and SUTTON, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  In 2009, Plaintiff-Appellant Archie Donald

("Donald") was fired from his position as a sample-room technician at Defendant-Appellee Buckman

Laboratories, Inc. ("Buckman").  Donald subsequently filed a complaint with the Equal Employment

Opportunity Commission ("EEOC") and then a civil action, alleging that his termination, as well as

other actions, were discriminatory and retaliatory.  The EEOC dismissed his complaint, and the

district court ultimately entered judgment in favor of Buckman after granting its motion to dismiss

and its motion for summary judgment.  Donald appeals the district court's summary-judgment order.

**I.  BACKGROUND**

Donald was employed at Buckman in the Technical Services Department from 1990 until his

termination on October 30, 2009.  R. 21-1, Ex. 1 (Donald Tr. 69:4–17) (Page ID #184); R. 26-1

(Donald Decl. at ¶¶ 1, 12) (Page ID #379, 382).  In 2009, Buckman began a reorganization of the

Technical Services Department that divided the employees into a chemists group and a support-personnel group. R. 21-4 (Thompson Decl. at ¶¶ 4, 11) (Page ID #282, 284). Donald, as a sample-room technician, was placed in the support-personnel group, which was under the management of Jon Thompson ("Thompson"). *Id.* ¶ 11 (Page ID #284). Thompson sent an email announcing the transition and explaining that Buckman would hold a workshop on the transition, at which the chemists group and the support-personnel group would meet separately. R. 21-1, Ex. 4 (Emails at 2–3) (Page ID #235–36).

> In response, Donald sent the following email:
>
> I'm hearing, and because all technical services were not copied on this thread, that the transition workshop for our department is going to be separate. If this is the case, I am totally dissatisfied with this arrangement. In your message below you state that []we will be holding "our" Technical Services transition Alignment Workshop. If we are one department "our" Technical Services Transition and Alignment Workshop should include everyone in the Technical Services department.

*Id.* at 2 (Page ID #235) (emphasis omitted). Jairus Winfrey, a chemist at Buckman, responded to Donald's email, noting that although the separate workshops were necessary for certain aspects of the transition, he believed that "the structure of these workshops appear to be causing some segregation within the teaming platform." *Id.* Donald responded, stating "My point exactly! Buckman is supposed to be a diversified company, but when I peer inside, I've seen and still see racial discrimination." *Id.* at 1 (Page ID #234). This email was reviewed by Human Resources ("HR"), which ultimately determined that the claims of discrimination were meritless. *Id.* Donald then filed a complaint with the EEOC. R. 1, Ex. A (EEOC Compl. at 1) (Page ID #11).

After the workshop, Thompson received training on a program that tracks the hours worked by non-salaried employees. R. 21-1, Ex. 3 (Pendleton Tr. at 109:3–10) (Page ID #230); R. 21-2 (Damrell Decl. at ¶¶ 12–16) (Page ID #251). During the course of this training, it was discovered that Donald had been arriving frequently after 9:00 a.m. for his 8:30 a.m. shift. R. 21-1, Ex. 3 (Pendleton Tr. at 111:4–6) (Page ID #231). Thompson approached Donald about this pattern, and Donald explained that he had made an arrangement with previous managers to arrive thirty minutes late on days that he needed to drive his daughter to school. R. 21-1 (Donald Tr. at 100:6–24) (Page ID #193). Donald avers that "[w]hen Thompson took over as supervisor, I addressed my schedule and he did not tell me there was any problem with my start time." R. 26-1 (Donald Decl. at ¶ 4) (Page ID #380). On September 18, 2009, after Donald had arrived late sixteen out of the previous twenty-eight days, Thompson verbally warned Donald that if he did not arrive at 8:30 a.m., he would face further disciplinary action. R. 21-1, Ex. 1 (Donald Tr. 144:3–15) (Page ID #214).

On October 25, 2009, Thompson sent Donald and other support personnel a reminder email for an October 29, 2009 meeting. R. 21-1, Ex. 4 (Emails at 4) (Page ID #237). An hour before this meeting, Donald sent an email to HR:

> I will not be attending. I spoke with Karen [Damrell, an HR generalist,] and she informed me that she nor Brenda [Pendleton, an HR generalist,] knew anything about this meeting; therefore, I will not be attending this meeting today because Jon [Thompson] and I together without Human Resource supervision is not acceptable. Arrangements need to be made to reschedule me for this meeting with another facilitator at another time.

*Id.* The following day, Thompson and Pendleton met with Donald. Thompson explained that this meeting was convened to discuss Donald's email, as well as his performance generally during the

3

third quarter. R. 21-1, Ex. 2 (Thompson Tr. at 54:4–6) (Page ID #225). It remains disputed what was said during this meeting.

After the meeting, Thompson and Pendleton informed Charles Westbrook, the Vice President of HR, that "Donald made a direct threat to his supervisor Jon Thompson in the presence of Brenda Pendleton." R. 21-3 (Westbrook Decl. at ¶ 9) (Page ID #258). They also reported that Donald "leaned forward in his chair in an aggressive manner, squinted his eyes at Mr. Thompson and said the reason he would not deal directly with Mr. Thompson was to 'keep both you [pause] and me [pause] safe.'" *Id.* ¶ 11 (Page ID #259). Westbrook attests that "[a] collaborative decision was made to immediately suspend Mr. Donald and send him home. After considering all the facts and circumstances, a decision was made to terminate Mr. Donald's employment." *Id.* ¶ 14. The written notice of termination listed insubordination and communicating a threat to a supervisor as the reasons for his termination. R. 21-3, Ex. D (Termination Letter at 1) (Page ID #274).

Donald amended his complaint with the EEOC in February 2010 to include his termination. R.1, Ex. A (EEOC Compl. at 2) (Page ID #12). The EEOC dismissed Donald's complaint and issued a right-to-sue letter on August 30, 2010. R. 1, Ex. B (Right to Sue Letter at 1) (Page ID #15). Donald filed a civil action in the U.S. District Court for the Western District of Tennessee on October 27, 2010, alleging violations of the Tennessee Human Rights Act and Title VII. R. 1 (Compl. at 1) (Page ID #1). Specifically, Donald alleged claims of race discrimination, hostile work environment, intentional infliction of emotional distress and outrageous conduct, and retaliation. *Id.* at 5–7 (Page ID #5–7). On May 21, 2012, the district court granted, in two orders, Buckman's

motion to dismiss and motion for summary judgment, and entered judgment for Buckman. *Donald v. Buckman Labs.*, No. 10-2773-STA-tmp, 2012 WL 1856413 (W.D. Tenn. May 21, 2012); *Donald v. Buckman Labs.*, No. 10-2773-STA-tmp, 2012 WL 1856473 (W.D. Tenn. May 21, 2012). Donald appeals the district court's summary-judgment order. Reply Br. at 6.

## II. STANDARD OF REVIEW

"We review de novo a district court's grant of summary judgment." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). "We review the evidence and draw all inferences in the light most favorable to [Donald] as the nonmoving part[y]." *Id.* Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

## III. DISCUSSION

Donald appeals the district court's decision to grant summary judgment to Buckman on his race-discrimination, hostile-work-environment, and retaliation claims, each of which arise under Title VII.[1] "Title VII makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 561 (6th Cir. 2004) (internal quotation marks omitted). Because Donald relies on circumstantial evidence in each of his claims, the *McDonnell Douglas* burden-shifting framework

---

[1]Insofar as Donald's discrimination and retaliation claims are also raised under the Tennessee Human Rights Act, the analysis is the same. *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001).

applies. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Under this framework, a plaintiff must first establish a prima facie case of discrimination, a burden that is easily met. *Singfield*, 389 F.3d at 563. If the plaintiff satisfies his burden, "the burden shifts to the defendant to articulate a nondiscriminatory reason for its actions." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008) (internal quotation marks omitted). "If the defendant articulates such a reason, the plaintiff may then show that the defendant's stated reason is merely a pretext for discrimination." *Id.* (internal quotation marks omitted).

## A. Race-Discrimination Claim

A plaintiff must establish four elements in order to satisfy his burden at the prima facie stage of a race-discrimination claim: "(1) that he is a member of a protected group; (2) that he was subject to an adverse employment action; (3) that he was qualified for the position from which he was fired; and (4) that he was treated differently than employees outside of the protected class for the same or similar conduct." *Singfield*, 389 F.3d at 561. The district court concluded that Donald had not proffered evidence sufficient to establish a prima facie case. *Donald*, 2012 WL 1856473, at *9–11. Specifically, the district court determined that Donald had not opposed Buckman's argument concerning the failure-to-promote allegation; that he failed to show that Beverly Richmond, his identified comparator, was similarly situated; and that he had not presented evidence that the reorganization was designed to segregate employees based on race.[2] *Id.* at *7, 9–11.

---

[2]The only mention of this purported segregation in Donald's opening brief is in his statement of facts: "Based on the Plaintiff's observation Plaintiff contends that black employees in the laboratory were separated by race and that blacks worked under one supervisor and non-protected

On appeal, Donald first argues that the district court erred in determining that Richmond was not similarly situated. Appellant Br. at 12.[3] Richmond is a white employee who also worked in the Technical Services Department and who was eventually allowed to modify her start time for personal reasons. R. 21-1, Ex. 1 (Donald Tr. at 96:3–21) (Page ID #191); R. 21-2 (Damrell Decl. at ¶¶ 9–10) (Page ID #250–51). Donald avers that he "raised concern about [Richmond] who clocked in at different . . . times then [sic] the regular schedule and after this meeting Richmond's schedule was changed too. Afterward, Richmond expressed her displeasure to me by saying 'thanks for getting my schedule changed too.'" R. 26-1 (Donald Decl. at ¶ 4) (Page ID #380). Donald further explained that he "was told by other[] employees that worked at Buckman that Beverly Richmond who also had a different start and end time was allowed to continue her different schedule of clock in after I left." *Id.* Damrell asserted that in November 2009, Richmond submitted a request to HR for a schedule modification "allowing her to arrive at work one hour earlier," which "was approved by her supervisor Jon Thompson." R. 21-2 (Damrell Decl. at ¶¶ 9–10) (Page ID #250–51).

---

employees worked under another supervisor." Appellant Br. at 4 (citing R. 1 (Compl. at ¶ 10) (Page ID #3)). Donald has not made any argument or produced any evidence in support of this statement, and it is not included as one of his five stated issues on appeal. Donald has thus waived this claim on appeal. *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995 (6th Cir. 2009). Similarly, Donald has waived the argument that the district court failed to address Donald's termination as it related to his race-discrimination claim. *Id.* Although Donald references termination as part of his race-discrimination claim in his brief, he does not address the district court's omission or explain how it might have erred. Appellant Br. at 16.

[3]Donald also argues that Richard Clark was similarly situated. Appellant Br. at 13. As this is the first mention of Richard Clark in any of Donald's filings, this argument has been forfeited.

The district court concluded that, rather than demonstrating disparity, the evidence shows that Donald "and his comparator were actually treated in the same manner: both were instructed that they needed to work a normal shift beginning at 8:30 a.m., and both employees complied." *Donald*, 2012 WL 1856473, at *11. The district court further focused on the following distinction between the two, which it found critical: "Richmond made a formal request to be allowed to arrive early and explained her circumstances to her supervisor and HR. There is no evidence that [Donald] ever made a similar request or that his own circumstances were substantially similar to Richmond's situation." *Id.*

We agree with the reasoning of the district court. In order for a plaintiff to establish that an employee is similarly situated, "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." *Singfield*, 389 F.3d at 562 (internal quotation marks omitted). Richmond complied with the initial change in policy and then made a formal request to modify her schedule, whereas Donald continued to arrive late without permission to alter his hours. Additionally, both Richmond and Donald were initially required to conform to the standard workplace hours. Richmond and Donald are thus not similarly situated in all relevant respects.

Donald also challenges the district court's determination that he did not oppose Buckman's failure-to-promote argument, noting that he "alleges in the Complaint, through his deposition testimony and through his Declaration that he applied for two positions in other areas." Appellant

8

Br. at 14. A review of Donald's opposition brief reveals that Donald included the following in his statement of facts:

> Plaintiff was made aware after his termination that a white employee named Les Timbs was placed in the position of entry level Assistant Operator an entry level position in the Chemical plant that on information from . . . Westbrook . . . , required some chemical plant experience. Plaintiff had previously sought to apply for the position in the Chemical Plant but was discouraged from applying as he was told that he had to have chemical plant experience to apply. Furthermore, Plaintiff was told by Charles Westbrook that if he wanted a position in the plant he would have to leave Buckman, work for another company in a plant environment.
>
> Plaintiff ultimately did apply for the Assistant Operator job but was not selected for the position.

R. 26 (Pl.'s Opp'n at 4–5) (Page ID #360–61). Donald did not, however, make any argument incorporating these facts or explain how this sequence of events supported a claim of race discrimination.

Even assuming that the district court erred in determining that Donald failed to oppose Buckman's motion for summary judgment on this issue, Donald has failed to produce sufficient evidence to satisfy his burden at the prima facie stage. Although Donald has established in his declaration that he "was told a white employee named Les Timbs was placed in the position of entry level Assistant Operator an entry level position in the Chemical plant that . . . Westbrook . . . told me required some chemical plant experience," there is no evidence in the record indicating what experience Timbs did or did not have at the time he was hired as an operator. R. 26-1 (Donald Decl. at ¶ 15) (Page ID #382) (emphasis omitted). Donald has not shown that he and Timbs are similarly situated.

9

Because Donald has failed to establish a prima facie case, we **AFFIRM** the district court's grant of summary judgment to Buckman on Donald's race-discrimination claim.

## B. Hostile-Work-Environment Claim

In order to prevail at the prima facie stage of his hostile-work-environment claim, Donald must show "1) that he is a member of a protected class; 2) that he was subjected to unwelcome racial harassment; 3) that the harassment was based on race; 4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and 5) the existence of employer liability." *Newman v. Fed. Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001). "In determining whether an environment is one that a reasonable person would find hostile or abusive and that the plaintiff in fact did perceive to be so, courts look at all of the circumstances . . . ." *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

The district court concluded that Donald "has failed to come forward with any evidence that he was harassed on the basis of his race, let alone that such harassment was objectively hostile or extreme." *Donald*, 2012 WL 1856473, at *12. The district court further reasoned that Donald could point only to discrete actions taken by Buckman and could not "demonstrate[] that his workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe and

pervasive to alter the conditions of his employment and create an abusive working environment." *Id.* (internal quotation marks and alterations omitted).

On appeal, Donald argues cursorily that "the Plaintiff was a member of a protected class . . . , there is no dispute that the Defendant['s] actions were changing his work start times . . . , in failing to require consistent standards for applying for positions from all applicants regardless of race and in ultimately terminating his employment was based on Plaintiff's race [sic]." Appellant Br. at 32. The only evidence in the record specific to the hostile-work-environment claim is Donald's deposition testimony and declaration detailing the emotional distress resulting from the purported discriminatory acts: "Now I have to be on pins and needles now. I have to work under like so-called pins and needles, be here at this time, do this, don't do that, do this." R. 21-1, Ex. 1 (Donald Tr. at 91:20–23) (Page ID #188). Donald also testified that he went to two doctors for his emotional distress and was prescribed Ambien to help him sleep. *Id.* at 93:7–94:22 (Page ID #189–90).

This type of distress, however, is insufficient to establish the requisite severity of a hostile-work-environment claim. *See, e.g.*, *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 601 (6th Cir. 2007) ("She instead admits that no one at Caterpillar ever made overtly racist remarks or threats to her, that Henry never raised her voice or made a threat apart from what allegedly took place at the January 20, 2004 meeting, and that the only 'harassment' she experienced was the imposition of the disciplinary action taken against her."); *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 708 (6th Cir. 2007) ("We note that the failure to remove Moss from the boxline charger position did result in her groin injury which kept her out of work for six months. This is a serious matter. However, this

11

incident, standing either alone or in conjunction with the alleged offensive utterances, does not constitute a hostile work environment."). We therefore **AFFIRM** the district court's grant of summary judgment to Buckman on Donald's hostile-work-environment claim.

## C. Retaliation Claim

After reviewing the evidence presented by Donald, the district court assumed for the purposes of summary judgment that both Donald and Buckman had met their respective burdens under the *McDonnell Douglas* burden-shifting framework. *Donald*, 2012 WL 1856473, at \*15–16. Nonetheless, the district court reasoned that Buckman was entitled to summary judgment on this claim under the honest-belief rule, which holds that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). In other words, an employee's "disagreement with the facts . . . does not create a genuine issue of material fact that would defeat summary judgment as long as an employer has an honest belief in its proffered nondiscriminatory reason." *Michael*, 496 F.3d at 598 (internal quotation marks omitted).

However, "[w]hen the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807–08 (6th Cir. 1998). Here, Donald argues that the district court erred

because "[n]ot only was Buckman Laboratories' proffered reasons for firing Plaintiff pretextual, but Buckman Laboratories was motivated to by its improper motive after the Plaintiff filed his internal complaint of racial discrimination that it took less than (24) twenty-four hours to investigate." Appellant Br. at 27 (emphasis omitted). Donald further contends that he "did in fact present evidence sufficient for a jury to believe that Buckman Laboratories' reasons for firing [Donald] had no basis in fact; and, that its reasons did not actually motivate the decision to fire [Donald]." *Id.* at 30.

The evidence that Donald provides in support of these arguments, however, relates to Donald's underlying retaliation claim—specifically, whether Donald established pretext—rather than to Buckman's decision-making process. Appellant Br. at 22–26. As we have explained previously, "[t]he key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action." *Michael*, 496 F.3d at 598–99 (internal quotation marks omitted). In other words, the critical issue here is whether Buckman engaged in a reasoned decision-making process prior to suspending, and ultimately terminating, Donald.

Despite his arguments that Buckman based its decision on an improper motive, Donald has not pointed to any evidence controverting Buckman's proffered evidence that it engaged in a reasoned decision-making process with respect to its decision to terminate Donald and that it held an honest belief that Donald had threatened Thompson. Rather, Donald focuses on disputing the sequence of events between himself and Thompson leading up to and during the meeting. Appellant

13

Br. at 22–26. Because Donald has not refuted Buckman's evidence relating to its decision-making

process, we must **AFFIRM** the district court's grant of summary judgment to Buckman on Donald's

retaliation claim.

## IV. CONCLUSION

For the reasons stated, we **AFFIRM** the judgment of the district court.