# STATE OF MICHIGAN

# COURT OF APPEALS

ONA LEE AGUILAR,

Plaintiff-Appellant,

v

CITY OF SAGINAW,

Defendant-Appellee,

and

INTERNATIONAL ASSOCIATION OF
FIREFIGHTERS LOCAL 102,

Defendant.

UNPUBLISHED
August 30, 2018

No. 339016
Saginaw Circuit Court
LC No. 13-021623-CD

Before: RONAYNE KRAUSE, P.J., and GLEICHER and LETICA, JJ.

PER CURIAM.

The circuit court summarily dismissed Ona Lee Aguilar's gender discrimination and retaliatory discrimination lawsuit against her employer, the city of Saginaw. Aguilar is one of a small number of female employees of the Saginaw Fire Department (SFD) and has dealt with harassment and hostility over the years as she worked her way up the ranks in a male-dominated field. Aguilar's suit, however, was based solely on the city's 2013 failure to name her as acting or interim fire chief and its 2014 failure to hire her as the city's permanent fire chief. The evidence supports that Aguilar's union discriminated against her and those parties reached a settlement. Although the evidence also supports that Aguilar continues to work in a hostile environment, Aguilar has not created a triable question of fact on her discrimination claims. Accordingly, we are bound to affirm.

## I. BACKGROUND

Aguilar became a Saginaw firefighter in the SFD in 1996. In 1999, the SFD promoted Aguilar to driver and in 2008 to lieutenant. In January 2011, Aguilar became a captain. She remained in the captain position for only six months before being promoted to training/safety officer (TSO). During these years, only a handful of women worked for the SFD, and the women were made to feel this difference. Male coworkers referred to the female firefighters by

-1-

derogatory euphemisms for lesbians. Between 2000 and 2011, Aguilar filed several harassment claim forms with the city, many of which were aimed against then-Battalion Chief Christopher Van Loo. While serving as Aguilar's superior officer, Van Loo demeaned Aguilar, singled her out for gopher jobs and micromanagement, and generally "mess[ed] with" her and "play[ed] games with" her. The city did nothing in response to these complaints. The fire chief during these years corroborated Aguilar's description of the SFD's atmosphere and agreed that several male employees targeted the female employees for discriminatory treatment.

Despite this course of harassment, Aguilar rose in the ranks at the SFD. While serving as TSO, Aguilar was considered second in command. Whenever the fire chief was out of the city, Aguilar served as temporary acting chief. When Fire Chief Earl Dean Holland decided to retire, he sought out interested employees to train for the chief position. Only Aguilar expressed an interest and then followed through with mentoring. In September 2011, Holland met with City Manager Darnell Early and Assistant City Manager for Public Safety Phillip Ludos and recommended that they consider Aguilar for his successor. Early was reticent to appoint a woman as fire chief, but Holland convinced him. Holland also spoke to Tom Raines, president of the International Association of Fire Fighters, Local 102 (the union), about promoting Aguilar. Raines suggested that the fire chief "should be someone out of the operations division rather than the administrative end of the department," like TSO Aguilar.

In 2011, as a result of Holland's recommendation, the city offered Aguilar the position of Interim Chief. Aguilar turned down the offer to allow her mentor, Ricardo Longoria, to fill the position. In February 2012, Early again offered Aguilar the position. Early advised that if Aguilar turned down the position, the city would extend Longoria's contract for an additional six months. Aguilar again demurred in favor of Longoria. The city changed gears, however, let Longoria go, and instructed Ludos to oversee the SFD until he resigned in August 2013. During Ludos's reign, Aguilar was instructed to take over many functions usually left to the fire chief. Other members of the SFD leadership filled in the gaps as well. Raines advised these individuals to file a grievance if they felt put upon. Aguilar declined to do so.

Upon Ludos's resignation, Early informally offered Aguilar the acting chief position and Aguilar accepted. Aguilar believed that Early would announce the appointment at the next city council meeting. But the union objected to the manner of appointment. Raines contacted Aguilar before the city council meeting and warned her that "anyone who took [the acting chief] position would be out of the union." Aguilar took this as a threat—"I felt like they were trying to coerce and scare me off from taking the position because they didn't want a female in charge."

At the same time that the city was looking for a replacement interim fire chief, the city and the union were negotiating the terms of a new collective bargaining agreement (CBA). The appointment of interim or acting fire chiefs was a topic of discussion, but the parties disagree as to why. Aguilar believes the city and the union conspired to prevent the appointment of a female fire chief, or that the union influenced the city to change how appointments were made to secretly further the union's discriminatory agenda. The city denied any nefarious motives. The union claimed that it wanted a policy by which the most senior person in a certain pay rank would be named acting or interim chief, removing politics and favoritism from the mix. Whatever the impetus, the city and union agreed to a procedure for the automatic selection of the interim/acting chief based on "the highest seniority in rank at the F6 pay range," which included

the TSO, fire marshal, and battalion chiefs. To be named as acting or interim chief, the highest seniority officer had to "be in good standing (having not been disciplined within the last twelve months)" and would be entitled to $400 extra in biweekly pay.

Battalion Chief Van Loo had six more years seniority than Aguilar and so was named interim chief. His appointment was made before the union voted to approve the new procedure and so his appointment was contingent upon the vote. Aguilar responded by filing a grievance with the city, challenging the city's failure to remunerate her for additional services during Ludos's term as de facto chief. The city denied the grievance, noting that Aguilar waited 1½ years to raise it and that Aguilar had not been officially named as acting or interim chief during the time in question.

Aguilar followed up by filing the current lawsuit, complaining that the city discriminated against her based on gender in failing to name her as interim fire chief and in withholding additional pay for the months she performed many of the fire chief's tasks.

Four months later, Aguilar filed a gender discrimination/harassment claim with the city alleging that Van Loo had made her working conditions unbearable since his appointment as interim chief. She asserted that Van Loo prevented her from fulfilling her duties as TSO by forbidding her to visit fire scenes to ensure that safety procedures were being followed and excluding her from attending free training sessions related to her position and training sessions she arranged with outside agencies. Van Loo ended Aguilar's representation of the SFD with the Saginaw County Fire Chiefs Association. Aguilar complained that Van Loo had interfered with her management of two grants she had secured for the SFD, forcing her to leave city council meetings and replacing her as the SFD's primary grant contact. He also undercut her efforts to arrange training opportunities for the department, refusing to send any department member to a class for first line supervisors that was scheduled and paid for before Van Loo took office. Aguilar then filed a first amended complaint adding these allegations.

The city then posted the permanent fire chief position and selected several qualified candidates to interview. The first-round interview panel consisted of Saginaw Assistant Human Resources Director Beth Carson Church, Saginaw Chief Inspector John C. Stemple, Saginaw Police Chief Brian Lipe, Saginaw Director of Water & Wastewater Treatment Services Kimberly Mason, union representative Gregory Simmons, and Livonia Fire Chief Shadd Whitehead. Ahead of the interviews, the union presented a list of questions it wanted the panel to ask the candidates. Church reviewed the questions and approved only one:[1]

---

[1] Church rejected questions that were more clearly pointed at Aguilar, such as whether the candidate had ever sued an employer and

> Explain your view of the following ethical dilemmas; supervisors playing favorites or not treating all employees fairly in like situations; re-using previously resolved issues to continuously create disharmony; and failure to take responsibility for any budgetary and accounting mistakes no matter how large or small. . . .

How much experience do you have as incident commander on a fire ground, years and approximate number of incidents? Do you have any experience as incident commander of a large, multiple alarm, or multiple agency incident? Can you give us a specific example of a large incident you commanded?

Church later noted that in hindsight, she had "[s]light[]" "misgivings" about asking this question because it appeared the union was "[p]ossibly" trying to "disfavor Aguilar." Church noted that the panel members "seemed to focus a lot on" this question when rating the candidates. But Church "felt better about" the question upon further reflection because it pertained to "work experience," a highly relevant factor in the hiring process.

Following the interviews, each panel member recommended two individuals for second interviews with the new city manager, Tim Morales. No one recommended Aguilar. In her written assessment, Church included in Aguilar's weaknesses that "[h]er appointment would not be supported by the rank and file within the [SFD]." Lipe opined that Aguilar "has zero experience as an Incident Commander which is critical in the event of a huge fire as well as gaining the trust and respect of the firefighters. Otherwise a qualified candidate."

Whitehead noted that Aguilar had a "[l]ack of credibility amongst rank and file due to limited operational and command experience." Whitehead also felt that Aguilar had jumped to promotions too quickly in the past and therefore did not

have the ability to . . . showcase [her] abilities as a supervisor to troubleshoot, to problem solve at that level with employees, the conflict resolution . . . . I know and I've seen it in organizations where people have moved position, and there's credibility issues . . . and it's very difficult to overcome that.

During the interview process, the panel members had some interaction about their choices. Whitehead, as an outsider, asked the other panel members what the role of the SFD's TSO was. Simmons answered this question for him. When asked whether union member Simmons's answers to his questions influenced his "impressions, viewpoints of the candidates," Whitehead responded:

Yeah, I think it gave me a better understanding of what their roles were and the roles within their organization, because I said it's much different in every organization. So I think it really gave me greater insight into the function of a certain position or rank through that questioning. So it helped me build, you know, an impression of what they've been exposed to, what they've done in that position, what their primary job tasks and responsibilities were, et cetera. So I guess to answer your question, yes.

Simmons provided the longest explanation regarding why he did not recommend hiring Aguilar:

Although [TSO] Aguilar has [18] years of service to the SFD; none of that service has provided her with any operational command experience. Ms. Aguilar downplayed this lack of command experience by stating that she still feels capable of taking command and that the Fire Chief is an administrative position

-4-

anyway. Although she does have lengthy and varied administrative experience, she has shown instances of fiduciary irresponsibility that make it impossible for me to recommend that she be promoted[.] [In her] appointment to the 40-hour position of [TSO], she did not question the practice of getting paid for 50 hours of PTO time when taking a 40-hour week off of work, a situation that has been corrected. Also, to my knowledge, past personnel who have held her current position worked from 0800-1700, Monday through Friday and took an hour for lunch; she works from 0800-1600, Monday through Friday and takes an hour for lunch. I do not know if any previous Fire Chief had changed the working hours of the [TSO]. It is also common knowledge in the SFD that she used a City vehicle to travel to Lansing to submit and present a Saginaw County grant application while wearing the uniform of the SFD [TSO]. Finally, when asked by the panel why she applied for the position at this time in her personal & professional career, she stated that she had been working towards it for a couple of years. However, shortly after she submitted her application, she mentioned to at least two SFD personnel that her attorney told her to apply because of her lawsuit.

In a way this brings me full circle to my recommendation of Acting Chief Van Loo. There are concerns that some of the fiduciary irresponsibilities being committed by [TSO] Aguilar have been allowed to continue on an on-going basis without the Acting Chief correcting the situations. It is my personal supposition that Acting Chief Van Loo has been forced to tread lightly around some situations involving [TSO] Aguilar due to the pending lawsuit, but that at the conclusion of the lawsuit and/or appointment of a new Chief, these fiduciary problems will be addressed. I have first-hand knowledge of the PTO usage factor abuse and correction, and am confident that other issues will be corrected as soon as possible.

Simmons made his recommendation following the interviews on behalf of the union. He reached his decision "[a]fter discussions with other panel members and extensive personal reflection." Simmons claimed not to have a preconceived preference whether Van Loo was named chief over Aguilar, but he did not think Aguilar should be promoted. He did not feel her "unqualified to be Chief," but explained, "I can't say that I gave qualification much consideration. My job was . . . to be there as a Union representative to select the person that I felt was going to be the best person to interact with the Union." Aguilar complained to Human Resources about Simmons being appointed as an interview panelist. Early in her career, Simmons had allegedly told Aguilar that "women don't belong in the fire service or in the Navy." The city did not follow-up on this complaint.

Stemple did not recommend Aguilar based "on [his] experience with working directly with that employee." Aguilar had "a great deal of training and education related to the fire service." She also rose in the ranks, but on the administrative side rather than in fire suppression. "The piece of experience that [Stemple] felt was missing was that of an incident command." Stemple found incident command important because "there have been times in the past when the Chief has had to assume that role due to multiple simultaneous incidents." Further, Stemple felt that the fire chief position required

a great deal of leadership skills and it takes a person that can gain a following among both the command staff and fire fighters. Based on my own observations I believe that Aguilar, based on her leadership and management skills and experience would have a difficult time gaining a productive following of current fire department personnel.

Ultimately, Morales selected Van Loo as the permanent fire chief. Aguilar filed a second amended complaint to allege that the city discriminated or retaliated against her by hiring Van Loo "notwithstanding the fact that [she] was and is more qualified for the position." Aguilar emphasized that Van Loo did not have administrative or budgeting experience and lacked the required Bachelor's Degree, and contended that his past discriminatory conduct made him unsuitable for the job. In a third amended complaint, Aguilar added a count against the union based on its discriminatory actions.

Following discovery, the city and the union filed motions for summary disposition. The court denied the union's motion in part, but the matter never proceeded to trial as the union reached a settlement agreement with Aguilar. In support of its motion, the city posited that Aguilar failed to state any adverse employment action taken against her—such as discipline, demotion, or reduction in pay—to support her retaliation claim. Second, the city contended, it would have been illegal under MCL 38.511(4) to appoint Aguilar as a successive interim fire chief without entering an agreement with the union. In any event, the city noted, city officials actually supported appointing Aguilar as the interim fire chief as evidenced by Early's three attempts to appoint her to the position. Third, the city asserted that it had not hired Aguilar as permanent fire chief because she was not selected for a second interview by anyone on the six-person interview panel. As noted by the panel members, they felt that incident command experience was essential and Aguilar was lacking in that area.

In her opposition motion, Aguilar described a very different picture of events. She described that Early offered her the position of acting chief on August 14, 2013, and that she accepted. Two days later, Raines threatened to kick Aguilar out of the union if she accepted the acting chief position. Only then, Aguilar asserted, did Raines approach the city and demand that it negotiate the acting chief position into the CBA. "[J]ust hours prior to the City Council meeting, at which [Aguilar] would be announced as Acting Chief," Director of Employee Services Dennis Jordan emailed Early and asked, "I told [Aguilar] that we were still deciding how we wanted to handle the Fire Chief idea, she seemed to think she was supposed to attend the council meeting tonight. Do you still require her to attend[?]" Early responded, "Did you tell her that a final decision has not been made? If so, then I don't think it is okay to tell her that it isn't necessary for her to attend until a final decision is made." In Aguilar's estimation, Jordan did the exact opposite and instructed Aguilar that she did not need to attend. Jordan then proceeded to meet with union officials without Aguilar's knowledge to negotiate the acting chief position. "Contrary to [the city's] representations, Mr. Jordan quickly agreed to Capt. Raines' demands." On August 21, Jordan emailed Raines, noting that he and Raines were on the same page but that Jordan had to get Early's agreement. Jordan then prepared a memo recommending that Early approve the agreement to select the acting chief based on seniority alone. Aguilar contended that this was done solely to prevent her, a female, from getting the position as she was second in seniority. The city then appointed Van Loo before it had to, before the letter of agreement was approved. Jordan subsequently denied Aguilar's grievance that Van Loo was

-6-

paid for serving as acting chief before the letter of agreement was signed when she had served as the de facto chief for over a year without additional compensation.

When seeking a permanent fire chief, Aguilar contended that the city purposely stacked the deck in Van Loo's favor by artificially inflating the importance of operation-side leadership to the fire chief role. First, the city added to the fire chief job posting a requirement of "five years' progressively responsible command experience." Then the city accepted a question from the union inquiring into the candidates' experience "as an incident commander on a fire ground." Aguilar asserted that Church later regretted including this question because she realized that the union "knew Chris Van Loo would have the most experience in that area." The city further revealed its bias when it allowed Van Loo to sit for an interview even though Tammy Pasterz filed a harassment complaint against Van Loo during this time period. And the city went forward with a candidate who lacked the necessary educational requirements—a bachelor's degree—and budget and administrative experience. When compiling a chart of qualifications of all the command officers in the SFD, Ludos opined that "there was nobody close to the qualifications of" Aguilar. And the "independent" fire chief brought onto the panel from Livonia lacked any knowledge of the SFD and asked the most biased panel member—Simmons—for a breakdown.

Aguilar challenged the city's position that she could not establish that its stated legitimate reasons for not appointing her acting chief and hiring her as full-time chief were pretext. Aguilar compared the facts of her case to those in *Hazle v Ford Motor Co*, 464 Mich 456; 628 NW2d 515 (2001), in which the plaintiff presented evidence from which a jury could infer that her employer rejected her promotion in favor of a less qualified white candidate. Here, Aguilar presented evidence that she possessed higher academic credentials and met more of the requirements listed in the fire chief posting. Along with evidence of the pervasive sex discrimination in the SFD, naming a less qualified male candidate over her for acting chief and permanent chief was sufficient to create a question for the jury, Aguilar argued.

Moreover, although the city claimed that it would be illegal to appoint any one as acting chief without a CBA, the city did name Van Loo and started paying him before the letter of agreement was signed, Aguilar emphasized. His appointment was therefore illegal. Aguilar further noted the evidence that Jordan was actively involved in the union's plot to prevent her from being named acting chief. And even if Jordan was unaware of the union's discriminatory animus, the union could have used him as a "cat's paw," i.e., the union as a biased subordinate could have used Jordan, a decision-maker, to accomplish the union's purposes. Aguilar also minimized the fact that the city had offered her the acting chief position twice in the past. Holland and Ludos had to convince the city that a female would be a good acting chief at those times. The city changed its mind after Holland and Ludos left. Aguilar further emphasized the city's reaction to her many harassment claims filed over the years, ignoring them.

At a minimum, Aguilar continued, the union employed a "cat's paw" process during the interview process for the permanent fire chief as well. Simmons influenced Whitehead and the union presented biased questions.

In relation to her retaliation claims, and quoting *Laster v City of Kalamazoo*, 746 F3d 714, 731-731 (CA 6, 2014), Aguilar contended that a plaintiff's "burden of establishing a

materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context." It is enough if the employer's action was sufficient to dissuade a reasonable employee from filing a discrimination charge. For example, "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." Quoting *Meyer v City of Center Line*, 242 Mich App 560, 571-572; 619 NW2d 182 (2000), Aguilar further contended that an employer's failure to take action to stop retaliatory discrimination is itself an adverse employment action.

At the hearing on the city's summary disposition motion, the city explained why its appointment of Van Loo as interim fire chief before the union ratified the CBA provision was of no import. Jordan testified that the city treated the agreement as "temporary probationary" pending the union members' vote. The city also expanded on its arguments that Simmons's placement on the permanent chief interview panel did not taint the procedure. Representation by the union was necessary because the fire chief would be a nonunion individual working with a unionized staff and would require a functioning relationship with the union. As to Simmons personally, his stray comment more than 15 years earlier did not disqualify him from participating in the interviews. The city also challenged the authenticity of Aguilar's objection to the incident command question, noting that when asked if she believed the question was used to "rig[] the game against" her, Aguilar responded, "The way that it was done, the way that it was presented, yes. The question itself, no."

The court asked Aguilar to explain why the incident command question presented by the union and asked by the interview panel was discriminatory. Aguilar contended that the question had to be put into context. Gender discrimination was rampant in the SFD. The city understood, as Church testified, that the union included the question to encourage the selection of its favored male candidate over the female candidate. Incident command was not as important in the SFD as the city would have the court believe. Although the fire chief might come to a fire scene to supervise, the battalion chiefs were still the individuals directing how to fight the fire. None of the battalion chiefs were women.

The court then asked the city how the question could be fair when "there's been no women that have been controlling the scene." The city replied that it was fair because incident command is "something that a fire chief . . . has to know." Aguilar "had every opportunity to gain this Incident Commander experience," the city argued, but made career choices that placed her in administration. Moreover, there would be times that the fire chief would have to serve as an incident commander, such as when multiple incidents occurred at once. "Additionally," the city contended, "you need to understand and have a knowledge of how the Incident Commander process or system works so that you can properly and efficiently allocate the resources, i.e., the staff that you have."

The court ultimately dismissed Aguilar's complaint in its entirety. In relation to the acting chief position, the court determined that Aguilar was a member of a protected class and had suffered an adverse employment action, and that she supported an inference of unlawful discrimination. The court also determined, however, that the city articulated a legitimate nondiscriminatory reason for not naming Aguilar as interim fire chief—that her appointment

-8-

would have violated MCL 38.511(4). The court concluded that she had not met her burden of overcoming this stated nondiscriminatory reason. The court rejected Aguilar's theory that Jordan had nefarious goals when he negotiated the CBA with the union; the act of negotiating was not itself nefarious. Moreover, Raines testified that the city was opposed to the union's proposal of selecting acting and interim chiefs on seniority alone. The court further discerned no evidence to support a conspiracy between the city and the union. The court also rejected Aguilar's cat's paw theory because the union was not a subordinate of the city, but rather an adverse party.

In relation to the permanent fire chief position, the court again found sufficient evidence to establish a prima facie case of discrimination but that Aguilar had not overcome the nondiscriminatory reason for passing her over for the position—a mixed-gender panel did not recommend her for a second interview. Aguilar argued that Simmons swayed the opinion of other panel members consistent with his discriminatory animus against her. However, the court noted, Whitehead indicated that his decision was not swayed by the panel members and Aguilar presented no evidence suggesting that Simmons even attempted to influence the other panel members. Moreover, Simmons took part in the interviews on behalf of the union and was there to promote the union's interests. His actions therefore could not be attributed to the city.

Finally, the court dismissed Aguilar's retaliation count, noting that she cited "mere workplace annoyances," rather than actionable employment actions. Even if the complained-of actions were actionable, the court observed no evidence that they were causally connected to Aguilar's protected acts of filing grievances and a lawsuit against the city.

## II. GENDER DISCRIMINATION

Aguilar challenges the circuit court's dismissal of her gender discrimination claims against the city based on its failure to appoint her as interim chief and to hire her as the permanent fire chief. Aguilar certainly established the misogynistic atmosphere of the SFD over the past 20 years and the city's lack of response to her previous legitimately raised concerns. But the city's prior inaction is not at issue in this case. Aguilar failed to overcome the legitimate, nondiscriminatory reasons cited by the city for the hiring decisions challenged in this suit.

We review de novo a circuit court's ruling on a summary disposition motion. *Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013).

> A motion under MCR 2.116(C)(10) "tests the factual support of a plaintiff's claim." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). "Summary disposition is appropriate . . . if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh*, 263 Mich App at 621. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon

which reasonable minds might differ." *West*, 469 Mich at 183. [*Zaher*, 300 Mich App at 139-140.]

MCL 37.2202(1)(a) of the Civil Rights Act (CRA) provides that an employer "shall not" "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment" based on sex. "The ultimate question in an employment discrimination case is whether the plaintiff was the victim of intentional discrimination." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 606; 886 NW2d 135 (2016) (quotation marks omitted).

A plaintiff need not present direct evidence of discrimination to avoid summary disposition. A plaintiff may present indirect evidence to create a prima facie case. *Hazle*, 464 Mich at 462.

In order to avoid summary disposition, the plaintiff must . . . proceed through the familiar steps set forth in *McDonnell Douglas* [*Corp v Green*, 411 US 792, 802-803; 93 S Ct 1817; 36 L Ed 2d 668 (1973)]. The *McDonnell Douglas* approach allows a plaintiff to present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination. . . .

Under *McDonnell Douglas*, a plaintiff must first offer a "prima facie case" of discrimination. Here, plaintiff was required to present evidence that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination. [*Hazle*, 464 Mich at 462-463 (quotation marks omitted).]

The burden then shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." The defendant must present evidence "that its employment actions were taken for a legitimate, nondiscriminatory reason." *Id*. at 464.

If the defendant meets this requirement, the burden shifts back to the plaintiff to show that the employer's stated reasons are mere pretext for unlawful discrimination. *Id*. at 465. Stated differently, the evidence must be " 'sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff.' " *Id*., quoting *Lytle v Malady*, 458 Mich 153, 176; 579 NW2d 906 (1998).

Aguilar established that she is a member of a protected class and that she suffered adverse employment actions when she was not named acting chief or promoted to fulltime fire chief. Aguilar presented evidence that she was qualified for the position, both through education and experience. Contrary to the city's arguments, Aguilar did present evidence that the positions were given to Van Loo under circumstances suggesting discrimination. Early had previously expressed shock over the idea of giving the fire chief position to a woman. And Aguilar had faced years of harassment and discrimination from certain members of the SFD with the city doing nothing to remedy the situation.

-10-

Regarding the acting chief position, the city provided a legitimate, nondiscriminatory reason for not naming Aguilar as acting chief. When Early offered Aguilar the acting chief position in 2013, it was illegal to do so. MCL 38.511(4) permits a city to name an acting fire chief if "there are urgent reasons" but with limitations:

> Whenever there are urgent reasons for filling a vacancy in any position in the fire or police department and there is no list of persons eligible for appointment, the appointing officer may nominate a person to the civil service commission for a noncompetitive examination. If the nominee is certified by the commission as qualified, after a noncompetitive examination, he or she may be appointed temporarily to fill the vacancy until a selection and appointment can be made after a competitive examination, and in the manner prescribed in this act. *However, the temporary appointment shall not continue for more than 3 months, nor shall successive temporary appointments be made to the same position.* [MCL 38.511(4) (emphasis added).]

The city had already violated this statute. When Holland retired, the city appointed Longoria for longer than the permitted three-month period. The city then left the fire chief position vacant for more than a year and placed an assistant city manager in charge. That individual merely delegated the fire chief duties to members of the SFD. The city found itself in a pickle when that assistant city manager decided to resign; it could not legally appoint another temporary fire chief because it did not have a "list of persons eligible for appointment," and the temporary appointment would be successive. Although the city wanted to essentially create its own list, the union wanted a say. The negotiations with the union led to the acting/interim chief position being selected on seniority basis within the SFD leadership.

Aguilar's evidence did not create a factual question regarding whether the city's reason for not naming her interim chief was pretext. "The inquiry at this final stage of the *McDonnell Douglas* framework is exactly the same as the ultimate factual inquiry made by the jury: whether consideration of a protected characteristic was a motivating factor, namely, whether it made a difference in the contested employment decision." *Hazle*, 464 Mich at 466.

> A plaintiff can establish that a defendant's articulated legitimate, nondiscriminatory reasons are pretexts (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision. [*Feick v Monroe Co*, 229 Mich App 335, 343; 582 NW2d 207 (1997).]

Aguilar's evidence cannot establish that *the city* was motivated by gender discrimination to keep her out of the interim chief position. The city manager offered Aguilar the position in August 2013 before learning that such appointment would be barred by statute and had offered her the position twice before. Raines testified that the city came into the CBA negotiations wanting full power and discretion to name an acting/interim chief. It was the union that wanted transparency and a way to easily determine who would be appointed. Aguilar presented no evidence beyond her conjecture that Jordan was motivated by discriminatory animus. Jordan never made any comment suggesting discrimination. Even the email in which Jordan instructed

Aguilar not to attend the city council meeting is not probative. It simply relayed a confusing message from Early.

If any party potentially bore a discriminatory animus at this stage, it was the union, represented by Raines. This is where the cat's paw theory of liability comes into play. As described by this Court in the unpublished opinion of *Clum v Jackson Nat'l Life Ins Co*, unpublished per curiam opinion of the Court of Appeals, issued November 5, 2013 (Docket No. 307357), unpub op at 7-8:

> Imputing liability to a principal based on a non-decisionmaker's [discriminatory] animus is colloquially referred to as the "cat's-paw" or "rubber stamp" doctrine. Under this doctrine, a plaintiff seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v Proctor Hosp*, [562 US 411, 415; 131 S Ct 1186[]; 179 L Ed 2d 144 (2011). Based on tort and agency principles, *id*. at [418-419], *Staub* accepted the existence of such liability. The Court held, "When a decision to fire is made with no unlawful animus on the part of the firing agent, but partly on the basis of a report prompted (unbeknownst to that agent) by discrimination, discrimination might perhaps be called a 'factor' or a 'causal factor' in the decision." *Id*.[]

> *Staub* continued:

> > Animus and responsibility for the adverse action can both be attributed to the earlier agent (here, Staub's supervisors) if the adverse action is the intended consequence of that agent's discriminatory conduct. So long as the agent intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable . . . . And it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm. Proximate cause requires only "some direct relation between the injury asserted and the injurious conduct alleged," and excludes only those "link[s] that are too remote, purely contingent, or indirect." We do not think that the ultimate decisionmaker's exercise of judgment automatically renders the link to the supervisor's bias "remote" or "purely contingent." The decisionmaker's exercise of judgment is also a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes. [*Id*. [at 419-420] (citations omitted).]

> This approach makes sense, asserted the Supreme Court, because employers "often allocate[]" duties among its managers and therefore any employment decision will be based on assessments and reports of intermediate supervisors. No employer should be able to purposefully shield itself from liability by allocating its duties in this manner. *Id*. at [420]. An employer's "independent investigation," which results in reasons beyond the discriminatory report to support the termination, can rehabilitate the employer's decision, however. *Id*.[]

*Staub* concluded, "Since a supervisor is an agent of the employer, when he causes an adverse employment action the employer causes it; and when discrimination is a motivating factor in his doing so, it is a 'motivating factor in the employer's action.' " *Id*. [at 421.] Ultimately, "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Id*. at [422].

The Sixth Circuit Court of Appeals has weighed in on the cat's-paw doctrine numerous times. In *Ercegovich v Goodyear Tire & Rubber Co*, 154 F3d 344, 354-355 (CA 6, 1998), for example, the court found relevant to establishing discriminatory motive "remarks by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision." The discriminatory remarks of an intermediate supervisor are also relevant to establish motive. *Id*. The existence "of a discriminatory atmosphere" in the workplace "tend[s] to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." *Id*. at 356 (quotation marks and citation omitted).

The problem in this case is that the union was not an agent of the city. The union is a separate and distinct entity formed to protect its members from the acts of their employer—the city. The union and the city are therefore adverse parties. The city and the union came into the negotiation with opposite stances and the union won out. But the union did not manipulate the city to act on its behalf to deny Aguilar the interim chief position based on gender. Accordingly, we discern no ground to resurrect Aguilar's gender discrimination claim against the city based on its failure to name her interim chief.

The city also provided a legitimate, nondiscriminatory reason for not hiring Aguilar as the permanent fire chief. A panel of six individuals interviewed several candidates who met the posting requirements for the fire chief position. None of those individuals recommended Aguilar for a follow-up interview.

Aguilar contends that this reason was actually a pretext for discrimination because Simmons bore a discriminatory animus and tainted the other panel members' decisions. However, as noted by the city, only Whitehead indicated that he had spoken to Simmons. Even if Simmons had tainted Whitehead's opinion, none of the other four panel members selected Aguilar and she still would not have been promoted.

Aguilar contends that a majority of the panel members cited her lack of incident command experience and her lack of support from the rank and file. These answers, she asserts, were prompted by the union's addition of the incident command experience question to the interview list. However, Aguilar has not presented evidence to create a question of fact that the city added this question out of a discriminatory motivation. Although Aguilar complains that the fire chief position is largely administrative, she does not deny that she would be leading a group of fire *fighters*. Aguilar contends that the last three fire chiefs were first TSOs, like her. However, Aguilar provides no evidence regarding these chiefs' résumés leading up to that point;

it is entirely possible that those chiefs had incident command experience first. Aguilar does not contest that she could have secured more incident command experience had she remained in the captain position longer. Moreover, Church testified that although she thought the question weighed in Van Loo's favor, she ultimately had no qualms about asking it.

As to Aguilar's inability to effectively lead the rank and file, certain city administrators sitting on the panel based this opinion on their interactions with Aguilar. They also thought the lack of incident command experience resulted in a lack of a bond between Aguilar and the rank-and-file fire fighters. Aguilar has not contested these reasons.

Aguilar again cites the cat's paw theory and claims that the union used the city to get its discriminatory question into the interview process. Although Aguilar complains that the union proposed the question, she has cited no substantive objection to the question's content; indeed, she admitted that the question was substantively sound. The union participated in the interview process on its own behalf, not on behalf of the city. The union wanted input into the right candidate to deal with the union, not to act on behalf of the city. So again, the union was not the city's subordinate, it was the city's adversary. Given this record, we discern no error warranting relief.

## III. RETALIATION

Aguilar also challenges the circuit court's dismissal of her discriminatory retaliation count. MCL 37.2701(a) prohibits an employer from "[r]etaliat[ing] or discriminat[ing] against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act."

> To establish a prima facie case of retaliation under the [CRA], a plaintiff must show (1) that the plaintiff engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action. [*Meyer*, 242 Mich App at 568-569, citing *DeFlaviis v Lord & Taylor, Inc*, 223 Mich App 432, 436; 566 NW2d 661 (1997).]

"A plaintiff may establish that she was unlawfully discriminated against through indirect evidence by way of the burden-shifting framework of *McDonnell Douglas*. . . ." *Rymal v Baergen*, 262 Mich App 274, 303 n 9; 686 NW2d 241 (2004).

Aguilar established that she engaged in a protected activity. Not only did she file a lawsuit, she also filed harassment complaints with the city and the Equal Employment Opportunity Commission. The city clearly knew of these actions.

However, the allegedly retaliatory acts cited by Aguilar were mere workplace annoyances, and not actionable adverse employment actions.

> [I]n order for an employment action to be adverse for purposes of a discrimination action, (1) the action must be materially adverse in that it is more than mere inconvenience or an alteration of job responsibilities, and (2) there must be some

objective basis for demonstrating that the change is adverse because a plaintiff's subjective impressions as to the desirability of one position over another [are] not controlling[.] [*Wilcoxon v 3M*, 235 Mich App 347, 364; 597 NW2d 250 (1999) (quotation marks and citations omitted, second alteration in original).]

Although there is no exhaustive list of adverse employment actions, typically it takes the form of an ultimate employment decision, such as a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. In determining the existence of an adverse employment action, courts must keep in mind the fact that work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action. [*Pena v Ingham Co Rd Comm'n*, 255 Mich App 299, 312; 660 NW2d 351 (2003) (quotation marks and citations omitted).]

It has to be remembered that for the 18 months before Van Loo was appointed as interim chief, Aguilar was performing many tasks beyond her TSO position description. Once an interim chief was in place, the SFD and the city no longer needed Aguilar to perform many of the tasks that she had taken on, such as being a member of the Saginaw County Fire Chiefs Association. Moreover, when a new boss takes over, he or she shakes up how the office is managed, such as by determining the hours the employees must be in the office and the reasons the employees are allowed to leave the office. Unfortunately, a new boss might also harbor enmity toward an existing employee. These feelings might render the job unpleasant. The supervisor might even limit the subordinate's duties that intersect with his or her own. But the poor relationship does not necessarily transform the supervisor's actions into retaliation.

Aguilar alleged that Chief Van Loo named battalion chiefs with less seniority as acting chiefs during brief absences from the city. If this is true, it is not cause for a discrimination action against the city. Rather, Van Loo would have violated the CBA and Aguilar should file a grievance with the union. If the union does not respond, that would be fodder for her claims against the union, not the city.

The only complaint which might amount to a materially adverse employment action is Aguilar's removal as SFD grant administrator. Potentially, this was a significantly diminished material responsibility. However, the city presented evidence that Van Loo removed Aguilar from this position because of her job performance. This was evidenced by a detailed memorandum from the city budget office. Aguilar has not alleged, let alone presented any evidence, that the shortcomings noted in the memorandum were caused by anyone other than herself. Accordingly, Aguilar would not be able to support even this allegation under the *McDonnell Douglas* shifting burden standard.

Aguilar contends that this Court should rely on the less onerous definition of adverse action found in *Laster*, 746 F3d at 731-732:

-15-

Plaintiff's burden of establishing a materially adverse employment action is "less onerous in the retaliation context than in the anti-discrimination context." *Michael* [*v Caterpillar Financial Servs Cor*p, 496 F3d 584, 595-596 (CA 6, 2007), citing *Burlington N & SF RR v White*, 548 US 53, 67-71; 126 S Ct 2405; 165 L Ed 2d 345 (2006)]. Unlike a Title VII discrimination claim, "the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." *Burlington N*, 548 US at 57. To establish the third element of the prima facie Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 68 (internal quotation marks and citations omitted). In analyzing the significance of any given act of retaliation, "[c]ontext matters. 'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.' " *Id*. at 69[,] quoting *Oncale v Sundowner Offshore [Svcs], Inc*, 523 US 75, 81-82; 118 S Ct 998; 140 L Ed 2d 201 (1998)[]. "A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id*. at 82[,] citing 2 EEOC 1998 Manual § 8, p 8-14). "An act that would be immaterial in some situations is material in others." *Id*. (citation omitted). "This more liberal definition permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context." *Michael*, 496 F3d at 596 (holding that placing employee on brief paid administrative leave and 90-day performance plan meet "relatively low bar" of materially adverse action for purpose of retaliation claim); see also *Halfacre v Home Depot, USA, Inc*, 221 F App'x 424, 432 (CA 6, 2007) (remanding for reconsideration, in light of *Burlington Northern*, whether assigning the plaintiff a poor performance-evaluation score constituted an adverse employment action for the purpose of setting forth a retaliation claim).

In *Laster*, 746 F3d at 732, the plaintiff employee

presented evidence that after filing a complaint with human resources in 2007 regarding what he felt was a racially discriminatory action, Plaintiff was denied training opportunities and privileges, singled out for violating at least two department policies that were selectively enforced against him, and disciplined more harshly than his peers for identical violations. In addition, the evidence viewed in the light most favorable to Plaintiff supports Plaintiff's allegation that KDPS [the Kalamazoo Department of Public Safety] initiated a frivolous and malicious investigation of Plaintiff following the June 7, 2010 incident. Plaintiff further alleges that he complained about harassing, discriminatory, and retaliatory conduct by his co-workers, and that KDPS did not take any corrective action.

The United States Court of Appeals for the Sixth Circuit held that "[f]acing heightened scrutiny, receiving frequent reprimands for breaking selectively enforced policies, being disciplined more harshly than similarly situated peers, and forced to attend a pre-determination hearing based on unfounded allegations of wrongdoing might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*.

Aguilar relies on *Laster* to claim that her exclusion from attending training sessions was an actionable adverse action. But this was not a case where Aguilar's exclusion limited her advancement opportunities. Aguilar's job was to schedule and arrange training sessions. The TSO job description requires her to conduct in-house training. As the lead of those sessions, Aguilar would have to attend. But Aguilar complains about being excluded from farmed-out training. As noted by the city, Aguilar's job was over once she scheduled those sessions.

Further, as found by the circuit court, Aguilar failed to create a triable issue of fact on the causation requirement. "To establish causation, the plaintiff must show that his [or her] participation in activity protected by the CRA was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." *Barrett v Kirtland Community College*, 245 Mich App 306, 315; 628 NW2d 63 (2001). "Something more than a temporal connection between protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation is claimed." *West*, 469 Mich at 186.

Aguilar again relies on federal cases to try to expand the evidentiary standard. However, she misquotes these cases. In *Mickey v Zeidler Tool & Die Co*, 516 F3d 516, 525 (CA 6, 2008), for example, the court actually held that temporal proximity can stand alone as evidence only in certain cases:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.
>
> The reason for this distinction is simple: if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation. Thus, employers who retaliate swiftly and immediately upon learning of protected activity would ironically have a stronger defense than those who delay in taking adverse retaliatory action. [Citation omitted.]

The *Mickey* rationale only applies in cases where the employee was so quickly retaliated against that he or she could not present any other evidence between his or her protected activity and the adverse employment action. The alleged actions against Aguilar happened over time,

giving her adequate opportunity to point to evidence beyond the mere temporal proximity of any adverse employment action and her lawsuit and grievances. The cited employment actions occurred over several months, not within a day, week, or even month of filing her lawsuit.

Similarly, Aguilar quotes only that portion of *Lamer v Metaldyne Co LLC*, 240 Fed App'x 22, 30 (CA 6, 2007), that serves her purpose. The relevant portion of *Lamer* provides in full:

> To show causation, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected conduct. Although no one consideration is dispositive, a causal link may be shown through knowledge combined with closeness in time. In other words, [t]here are . . . circumstances where temporal proximity, considered with other evidence of retaliatory conduct[, is] sufficient to establish a causal connection. [Quotation marks and citations omitted, alterations in original.]

According to the plain language of *Lamer*, temporal proximity standing alone is not enough.

In her deposition, Aguilar asserted that the causal connection was obvious because Van Loo started treating her differently after she filed suit. However, it is also true that Van Loo started treating Aguilar in the ways alleged after he became chief and after he learned of poor administration of the SFD's grants. By her own words, Aguilar cites nothing more than temporal proximity. This is not enough to create a triable fact question in a retaliation case.

We affirm.

/s/ Amy Ronayne Krause
/s/ Elizabeth L. Gleicher
/s/ Anica Letica

-18-